THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVEN MOODY, Defendant-Appellant.

First District (2nd Division)   No. 1—87—1578

Opinion filed May 22, 1990.

Randolph N. Stone, Public Defender, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago, for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant appeals from his conviction for murder, claiming that the circuit court erroneously: (1) admitted expert testimony at trial; (2) permitted the State to bolster witness testimony; and (3) allowed the State to impeach defendant with his post-arrest silence. Defendant also charges that he was not proved guilty beyond a reasonable doubt.

Because an issue is raised as to whether defendant was proved guilty beyond a reasonable doubt, the evidence adduced in this case must be set forth in some detail.

On August 29, 1985, defendant was arrested for the shooting of Ronald or Ronnie Lee (Lee) in Chicago, who died of his gunshot wounds at 12:47 p.m. that same day. A jury convicted defendant of murder, and he was sentenced to 25 years in the custody of the Illinois Department of Corrections.

At trial, Lieutenant Charles Mandel testified he received a call of

"shots fired" while on patrol at 12:30 a.m. on August 29, 1985, drove to the 8600 block of Kingston and saw a man pointing southward in an alley. Mandel proceeded down the alley to the rear of 8623 Essex, where he saw a man lying in a pool of blood, bleeding from the head and neck. The victim told him "Moody shot me" and that defendant drove away in an "apple red Pontiac." Mandel saw a packet of white powder on the ground, near the victim's body. After calling for an ambulance, Mandel left the scene to look for the perpetrator. Unsuccessful, he returned to the alley and noticed that police officers Ron Coleman and John Franklin had someone in the back seat of their squad car. Mandel told neither officer that he knew the name of the offender, because the officers told Mandel "they had an eyewitness to the incident" who "had all the information." Mandel told no one at the State's Attorney's office of the victim's remarks until a year and one-half after the incident. He made no written report of the shooting; his job of watch commander was supervisory in nature, and he was not required to make written reports.

Officer Franklin averred he was in his squad car with Coleman at approximately 12:30 a.m. on August 29, 1985, when they received a radio call of "shots fired" and then of a "man shot in the alley of 86th and Essex." Driving to the scene, the officers noticed a man on the corner of "87th and South Chicago," jumping up and down, waiving and yelling for the car to stop. The man, whom Franklin identified as (Dalton) "Woods," said, "Somebody just killed my buddy," got into the squad car and directed the officers to where the victim lay in the alley, face up, with numerous wounds to the head and neck. The victim was not moving, and Franklin believed him to be dead. When they touched the victim, however, he raised his upper torso and attempted to stand. Franklin also saw a clear plastic bag of white powder near the victim's body.

Detective Peter Dignan asserted he arrived at the scene at approximately 12:30 a.m. Franklin, Coleman and Woods were still in the alley. At approximately 2 a.m., he and his partner, Detective Buffo, were taken by Woods to defendant's apartment at 7620 South Shore Drive. Woods knocked on the door and identified himself to defendant as "Dog." The door swung open, and defendant came to the door pointing a gun at Dignan and Buffo. Dignan kicked in the door, grabbed defendant's gun, "took [defendant] down" and disarmed him. Dignan and Buffo kicked and hit defendant as they struggled with him for control of the gun. Dignan described defendant's behavior as loud and combative, and that defendant appeared to be under the influence of narcotics. Dignan was unaware defendant lost a tooth dur-

ing the scuffle. After he disarmed defendant, Dignan turned him over and handcuffed him, saying "You are under arrest for shooting Ronald Lee." Defendant then said "Okay, okay, I did it." Dignan denied striking defendant with his own revolver when struggling with defendant.

Forensic pathologist Barry Lifschultz averred the autopsy he performed on August 30, 1985, revealed four gunshot wounds to Lee's body, namely: a wound in his right chest; another at the right back of his neck, where the bullet entered and passed through the back of Lee's mouth; a third where the bullet "perforated the skin of" his right ear, went through the rear of the oral cavity and exited on the left side of Lee's face; and a final wound on the right side of Lee's face or neck, with an exit hole at the back of his neck. Lifschultz maintained that there was no damage to Lee's voice box or tongue, and that none of the wounds described made it physically impossible for him to speak.

Deotrise Vance, defendant's second cousin, testified that she lived in defendant's apartment in August 1985 and was told by him that he intended to kill Lee because defendant was "tired of Jackie being upset with" Lee. Jackie Moody was defendant's cousin, the former girlfriend of Lee and the mother of Lee's child. Defendant told Vance he planned to "lure [Lee] down there" with cocaine. On August 28, 1985, Vance was with defendant in his apartment and noticed he had a handgun and saw a clear plastic bag of white powder in a suitcase in defendant's closet. She also heard defendant make a telephone call from the apartment to Thelma Lee, Lee's mother, telling Thelma that he wanted to get in touch with Lee and that he had information "someone was out to get" Lee. Defendant wanted to use Vance's car to drive to Lee's home, but Vance refused.

Vance next spoke to defendant by telephone several days after his arrest and he eventually admitted to her that he killed Lee. He threatened Vance that he would kill her if she told anyone that he murdered Lee and continued to call Vance collect, several times a day, until December 1985, when she moved from the apartment. He continually threatened Vance and warned her he could have her killed even though he was in jail. She changed her telephone number once. Vance never discussed defendant's plans to murder Lee with anyone prior to the incident. She met with defendant's attorney in September 1985; paid him $150 for his services; told him she believed defendant killed Lee; did not tell him about defendant's threats; and did not inform him that she intended to testify for the State at trial. She spoke with two other defense attorneys in February 1987 and told them she

would testify on the State's behalf.

Thelma Lee testified that the victim, her son, was living in her home on August 28, 1985, when defendant called there approximately five times, identifying himself by name. Defendant made one of the calls between 7 and 8 p.m. and informed Thelma someone had a "hit out on" Ronnie. Thelma told Lee defendant had been calling for him. A few minutes after 11 p.m. on August 28, Lee was at home with Woods and a third person; Lee left soon after with Woods. She next saw Lee at the hospital on August 29.

Thomas Bachelder, an evidence technician with the Chicago police department, testified that he performed an atomic absorption gun residue test on defendant on August 29, which consisted of wiping both sides of defendant's hands with chemically treated cotton swabs, sealing the swabs in vials and delivering them to the crime lab's microanalysis section. Bachelder stated that obtaining a positive residue test 30 hours after a person fired a handgun was improbable. The maximum amount of time after discharge of a gun the residue test could be expected to prove positive would be four to five hours.

In 1985 Jean Goliak was employed as a "criminalist" in the police department's crime lab. She analyzed the swabs from the gun residue test and testified that the residue on defendant's hands indicated he discharged a firearm, was in close proximity of a firearm when it was discharged, or handled a firearm that had been discharged. The highest concentration of residue was on the back of defendant's right hand. Goliak contended that if a person fires a gun, the highest concentration of residue falls on the back of his firing hand; if he handles a gun only, the highest concentration is on the palm of the hand.

Defendant's first attorney averred he met with Vance on September 16, 1985, and that she never told him she believed defendant killed Lee, but informed him she didn't think defendant was capable of such an act and believed defendant innocent.

Jackie Moody testified she was at the home of her sister, Debra Moody, on August 28, sometime between 10 p.m. and midnight, when defendant came to the residence and asked her, "Where's Dee Dee [Vance]?" Jackie noticed defendant had a gun in his hand. She admitted failing to give the authorities this information until a week before the trial, but said she had never had an opportunity to meet with them until just before trial.

Defendant, on his own behalf, insisted he never told Vance he intended to kill Lee and never threatened her. He was self-employed as a tailor, and about August 23, 1985, Woods came to his apartment to look at some suits. Woods told defendant there was "bad blood" be-

tween Woods and Lee and that Woods "was going to kill him about some things," including the fact Lee "shot up" the house of Woods' neighbor and shot at the neighbor's dog. Woods also said he and Lee had entered into a "cocaine deal" together and Lee "took the money and hadn't gave [sic] him any cocaine."

Defendant again saw Woods at 10 p.m. on August 27, as defendant was walking down the street carrying a garment bag. Woods and another man drove up to him, stopped him, and asked to see any suits defendant had. After conversing about clothes, Woods asked defendant if he could take them someplace where they could buy cocaine. Defendant declined, and Woods' companion became "agitated" and appeared to reach for something. Defendant began to run away from them and heard three gunshots fired after him; Woods and the other man then got in their car and proceeded after defendant. Defendant pulled out his own gun and fired three or four shots back at the car, which then turned around and drove in the opposite direction. Defendant testified he spoke to Lee by telephone on the evening of August 28 and informed him of the incident with Woods and that Woods had threatened to kill Lee. Defendant also warned Thelma that threats were directed against her son, but not by whom.

On August 29, defendant averred, he was asleep in his apartment at midnight; at approximately 1:45 or 2 a.m. he heard a knock at his door and Woods' voice saying, "This is Dog." He cracked the door and saw a man pointing a gun at him, and slammed the door shut. Defendant had his own revolver in his hand because Woods had tried to "gun [him] down" the preceding evening and because defendant knew Woods "has been in prison for murder." A voice on the other side of the door said, "Open the door. This is the police." Defendant complied after he put his own revolver down. When he opened the door, police entered his apartment and "immediately began to beat" defendant "to the ground." Defendant described the beating as "pretty bad" and maintained he lost a tooth when hit in the mouth with a pistol butt. One of the officers was Dignan. When the police stopped hitting defendant, they attempted to talk to him, but he replied only that he was a veteran and "wanted to stand on my fifth amendment rights to see a lawyer."

Defendant stated that he was thereafter taken to the police station and that he refused to answer any questions, though he did make certain statements, such as he was a Chuck Taub Indian and that he had been hit by a car. He couldn't recall telling authorities, however, that: the last time he heard about Lee was three weeks prior to the shooting when Lee allegedly kidnapped defendant's nephew; he vis-

ited his son on August 28 and returned home at about 7 p.m.; and he then left his apartment alone to walk on the lakefront for about an hour. Defendant further denied telling authorities that he had called Thelma Lee on August 28, telling her that members of defendant's family were "talking about killing [Lee]." Defendant contended he did not fire a gun earlier on the day of his arrest.

On cross-examination, defendant first said that he did not wash his hands in the period between his shoot-out with Woods on August 27 and his submission to the gun residue test on August 29. He then testified, "I didn't say that I didn't wash my hands. I didn't do a lot of washing with my hands." Finally, this exchange occurred: "[Assistant State's Attorney Quinn]: The question is, did you wash your hands? Defendant: I can't recall." Defendant never told police about his earlier confrontation with Woods because he knew he had violated the law by having a gun on his person and for firing it within city limits.

Assistant State's Attorney Wayne Jakalski said he interviewed defendant on August 29 and August 30, at which time defendant contended he: hadn't seen Lee for three weeks; knew "there was something involving a kidnapping of his nephew"; talked to Thelma Lee five times on August 28; arrived home before dusk on August 28 and went for a walk along the lakefront for an hour.

The court sentenced defendant and denied his post-trial motion. He appeals.

I

Defendant first assigns error to the admission of evidence technician Bachelder's testimony as an expert, which he claims lacked sufficient foundation. Defendant insists the court improperly overruled defense counsel's objection where the State failed to establish Bachelder's qualifications to analyze gunshot residue results, as opposed to merely administer the process.

■ The State bears the burden of demonstrating that, because of skill, training or experience, an individual is better able to form a more accurate opinion as to matters under consideration than the ordinary person. (*People v. Park* (1978), 72 Ill. 2d 203, 209, 380 N.E.2d 795; *People v. Pruitt* (1974), 16 Ill. App. 3d 930, 939, 307 N.E.2d 142.) Only if the resulting error is clear and prejudicial will this court usurp the circuit court's broad discretion to accept an expert as qualified. *People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 1019, 356 N.E.2d 891.

Bachelder described his training in the administration of gunshot

residue tests as: an eight-hour session taught by the Chicago police department chemistry and microanalysis sections; and the "practical application" of conducting the test 200 to 300 times since 1984. He has testified approximately 75 times and in each case was certified an expert in administering the test. He stated he does not analyze the residue on the swabs delivered to the crime lab and learns the results of the tests by asking those who performed them or if someone else tells him.

■ The evidence above stated recalls *People v. Owens* (1987), 155 Ill. App. 3d 990, 999, 508 N.E.2d 1088, where the court found the admission of a crime technician's testimony regarding "blood spatters" at the crime scene improper: "[T]he State did not establish Knight's qualifications as a blood-spatter analyst. The State did not produce any evidence of *** Knight's training or experience in the field of blood-spatter analysis." (See also *People v. Perry* (1986), 147 Ill. App. 3d 272, 275, 498 N.E.2d 1167; *People v. Adams* (1981), 102 Ill. App. 3d 1129, 1134, 430 N.E.2d 267.) Bachelder here emphasized his experience was limited solely to administration of the test and that he learned of test results only through those who actually analyzed the swabs. The court therefore erred in certifying Bachelder qualified to render an opinion concerning residue test analysis.

Any error spawned by Bachelder's statement that a positive test result could not be achieved 30 hours after discharge of a weapon, however, was harmless. Defendant's equivocation on the question of when he last washed his hands prior to arrest decreased the impact of Bachelder's conclusion to such a degree that it could not fairly be deemed prejudicial.

Other statements going to the time lapse between discharge of a weapon and the performance of the gun residue test, moreover, were acceptable. Bachelder maintained that, from his own personal observation, tests administered more than five hours from the discharge of the weapon were more likely to yield negative results than tests performed within a shorter period of time. Such a conclusion, based on information volunteered to him by individuals analyzing the swabs, was adequately grounded in personal experience to constitute an admissible professional opinion. (*People v. Wade* (1977), 51 Ill. App. 3d 721, 728, 366 N.E.2d 528.) The information was properly submitted to the jury for whatever weight they may have chosen to give it.

## II

Defendant next contends the court erred in allowing the State to impeach his exculpatory trial testimony with evidence of his post-ar-

rest silence and argue the fact of this silence as evidence of his guilt.

■ The State responds that defendant waived this issue by neglecting to object at trial or by post-trial motion to the introduction of the evidence. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) Defendant here unsuccessfully moved *in limine* to bar his impeachment with matters he failed to tell police, which may explain counsel's neglect to voice objections when the evidence was introduced at trial; nevertheless, defendant failed to object with specificity in his post-trial motion, ordinarily barring appellate review. *People v. Enoch*, 122 Ill. 2d at 187; *People v. Smith* (1985), 139 Ill. App. 3d 21, 27, 486 N.E.2d 1347.

■ The use of an arrestee's silence to impeach a subsequent explanation has been held "fundamentally unfair," given the "insolubly ambiguous" message broadcast by one exercising his right not to speak. (*Doyle v. Ohio* (1976), 426 U.S. 610, 617-18, 49 L. Ed. 2d 91, 97-98, 96 S. Ct. 2240, 2244-45.) Review of such questions otherwise waived is mandated where, as here, defects in the proceedings below impinge upon "substantial rights." *People v. Walker* (1985), 109 Ill. 2d 484, 497, 488 N.E.2d 529; see also *People v. Monaghan* (1976), 40 Ill. App. 3d 322, 326, 352 N.E.2d 295.

Due process precludes a prosecutor from impeaching defendant's exculpatory testimony, offered for the first time at trial, by cross-examining defendant regarding his failure to inform police of his explanation after receiving *Miranda* warnings at the time of his arrest. *Greer v. Miller* (1987), 483 U.S. 756, 762-63, 97 L. Ed. 2d 618, 628, 107 S. Ct. 3102, 3107; *Doyle v. Ohio*, 426 U.S. at 619, 49 L. Ed. 2d at 422, 96 S. Ct. at 2245; *People v. Robinson* (1976), 44 Ill. App. 3d 447, 449, 358 N.E.2d 43; *People v. Monaghan*, 40 Ill. App. 3d at 326.

Defendant's uncontradicted testimony in the case *sub judice* established that he asserted his right to an attorney immediately after police officers subdued him at his apartment on August 29. He additionally raised for the first time at trial the alleged threats made by Woods against Lee's life and the fact of his confrontation with Woods on August 27, 1985.

On cross-examination, the State probed defendant's failure to explain these events to authorities in August 1985, including whether he ever reported to the police that: Dalton Woods had told him that he wanted to kill Ronald Lee; Woods wanted to shoot Ronald Lee over a shooting of a neighbor's dog; Woods wanted to kill Ronny Lee over a cocaine deal; and Woods had tried to kill him earlier on the 27th of August 1985. He was asked whether the first time he ever told anybody that: he was shot at by Woods and his partner on the 27th of

August was at trial; and Woods had threatened to kill Ronny Lee was at trial. He was further questioned whether: he ever reported the shoot-out he had near 74th and Coles, when he shot four shots, and Woods and his partner shot three shots at him; and he ever reported the shoot-out when Woods was there in his apartment accusing him of murdering Ronny Lee.

In closing and rebuttal argument, the State argued the significance of defendant's post-trial silence to the jury, stating if they were victims of armed robbery and someone was shooting at them, so that they were victims of attempted murder, or aggravated battery, they certainly would call the police; that after they were charged with a murder they were going to say something to the police about the fact "this guy been over bothering [them], nearly stuck [them] up, and nearly killed [them] out on the street two days earlier."

■ The State may impeach exculpatory statements inconsistent with remarks made by defendant before trial. (*People v. Chriswell* (1985), 133 Ill. App. 3d 458, 466, 478 N.E.2d 1176.) Here, however, defendant consistently refused to answer the authorities' questions before trial. The State thereby possessed no statements "manifestly inconsistent" with defendant's trial testimony which could properly be used for impeachment purposes. *People v. Nolan* (1987), 152 Ill. App. 3d 260, 268, 504 N.E.2d 205.

■ This was not harmless error. The State inflicted serious damage on defendant's credibility and undermined his alibi, factors critical to his defense. (*People v. Nolan*, 152 Ill. App. 3d at 268.) The court never instructed the jury to disregard evidence of defendant's silence following his arrest. (See *Greer v. Miller*, 483 U.S. at 763, 97 L. Ed. 2d at 629, 107 S. Ct. at 3107-08.) This was substantial error which requires reversal.

## III

Defendant also urges error in the State's efforts to bolster Deotrise Vance's testimony with evidence of her prior consistent statements.

■ Testimony regarding a prior consistent statement is inadmissible, except when used to refute an express or implied charge of recent fabrication (*People v. Shum* (1987), 117 Ill. 2d 317, 340-41, 512 N.E.2d 1183; *People v. Olesch* (1986), 143 Ill. App. 3d 577, 587, 492 N.E.2d 1381) or of a motivation to testify falsely (*People v. Shum*, 117 Ill. 2d at 340-41).

On cross-examination, Vance admitted she never told defendant's lawyer of the threats defendant directed against her, and first told

the authorities in 1987 of her knowledge of defendant's intention to kill Lee. She did not inform Thelma Lee of defendant's plans, although she had known Lee's mother for several years.

On redirect examination, she was asked a series of questions which had the clear effect of bolstering her testimony on direct examination. The State correctly observes that these questions could be inferred as rebutting recent fabrications or an inference of a motivation to testify falsely. Defense counsel objected to all but the first question and was sustained on each objection. The court instructed the jury at the close of the case to ignore evidence upon which objections were sustained. The mere occurrence of improper remarks alone does not mandate reversal. (*People v. Whitfield* (1986), 140 Ill. App. 3d 433, 440, 488 N.E.2d 1087.) Timely objection by defense counsel and an appropriate admonition by the court will prevent error, or in the event error occurs, render it harmless, even when the alleged error occurs more than once. (*People v. Olesch*, 143 Ill. App. 3d at 588; *People v. Taylor* (1977), 53 Ill. App. 3d 810, 817-18, 368 N.E.2d 950; see also *People v. Rowe* (1983), 115 Ill. App. 3d 322, 328, 450 N.E.2d 804.) The challenged remarks do not merit reversal as material factors in defendant's conviction, or in prompting a judgment different from that which would have resulted absent the alleged impropriety. (*People v. Olesch*, 143 Ill. App. 3d at 586-87.) No error occurred below from the State's attempted use of Vance's prior consistent statements.

## IV

Defendant's last contention attacks the sufficiency of the evidence presented at trial, insisting that the State failed to establish his guilt beyond a reasonable doubt.

Reversal is permissible only where the evidence is so palpably contrary to the finding of guilt, or so unreasonable, improbable or unsatisfactory that it raises reasonable doubt of defendant's guilt. (*People v. Olesch*, 143 Ill. App. 3d at 584.) The fact of defendant's conviction requires this court to view all evidence in a light most favorable to the State. *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.

Evidence adduced in the instant case demonstrated an identification by the victim of the individual who shot him, and defendant's statement "Okay, okay, I did it," upon his arrest for shooting Lee. Vance testified that defendant told her weeks before the shooting that he intended to kill Lee and the means by which he intended to do it, all of which was corroborated by the presence of a bag of white pow-

der next to the victim's body at the crime scene and the fact his death occurred by shooting.

Defendant's alibi defense and credibility were substantially impeached by the following evidence: Jackie Moody's testimony placing him outside of his apartment and with a revolver in his hand sometime between 10 p.m. and midnight on August 28; Thelma Lee's testimony that she received five telephone calls on August 28, informing her that a "hit" was out on her son; Vance's statement that she heard defendant phone the Lee residence that day, telling Thelma Lee her son's life was in danger; and Assistant State's Attorney Jakalski's averments regarding defendant's whereabouts on August 28. Forensic evidence introduced at trial established that the gun residue found on defendant's right hand was consistent with someone who had discharged a firearm. Defendant's statement that he couldn't "recall" whether he washed his hands on the day of his arrest and expert testimony that positive results on the residue test were unlikely more than five hours after discharge of a firearm undermined defendant's contention that the residue on his hand was from the alleged shootout with Woods on August 27.

■ Citing *People v. Thomas* (1979), 75 Ill. App. 3d 491, 493, 394 N.E.2d 624, defendant argues that the "[o]missions, discrepancies, and improbabilities" in the police officers' and Vance's testimony rendered their statements incredible. It is the jury's province, however, to weigh the evidence presented, judge the credibility of the witnesses and determine facts. *People v. Rowe*, 115 Ill. App. 3d at 325.

■ The alleged weaknesses in the witnesses' testimony in the instant case were neither as material nor as fatal to the State's case as defendant argues. Mandel conceded he failed to record Lee's dying declaration and to inform Coleman and Franklin of the statement, yet he also stated his duties did not include making written reports and that the other officers had an eyewitness in custody who provided them with the information they needed. Franklin concurred that his written report described Lee as "unconscious" at the scene, but his assertions at trial that Lee lay perfectly still with his eyes closed until Franklin touched him are not clearly contradictory. Franklin also reminded the jury that reports are merely summaries of the events in question. Although Vance's statement that she informed the defense attorney in 1985 of her belief that defendant murdered Lee was contradicted, defendant offered no evidence other than his own testimony to rebut Vance's assertions that defendant threatened to kill her if she revealed his guilt to anyone.

The evidence cannot be portrayed as so palpably contrary to the

finding of guilt as to justify, alone, a reversal of defendant's conviction.

The error committed by the State in introducing the fact of defendant's post-arrest silence denied defendant a fair trial and requires reversal and remandment of the conviction entered below for a new trial.

Reversed and remanded.

BILANDIC, P.J., and EGAN. J.,* concur.

---

*Justice Egan participated in the decision of this case prior to becoming a member of the sixth division of the appellate court.