THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARVIN GLEASH, Defendant-Appellant.

First District (2nd Division)   No. 1—88—0797

Opinion filed February 5, 1991.

Michael J. Pelletier and Pamela Z. O'Shea, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee G. Goldfarb, Bonnie Meyer Sloan, and Guy L. Miller IV, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Pursuant to a jury trial, defendant Marvin Gleash was found guilty of murder and subsequently sentenced to 40 years in the Illinois Department of Corrections. He appeals both his conviction and his sentence, raising as issues: (1) whether his trial counsel was burdened by a conflict of interest and thus did not provide effective assistance of counsel; (2) whether he was denied a fair trial by the circuit court's refusal to excuse certain veniremen for cause so that he had to exclude them by the use of his peremptory challenges; (3) whether he was denied a fair trial where the prosecutor implied that defendant had committed other crimes and argued facts not in evidence, and the circuit court denied a mistrial based upon its own investigation; and (4) whether the circuit court improperly sentenced him because it erroneously believed that he was eligible for an extended term.

On October 5, 1986, Tom Briggs was shot, and on October 7, 1986, he died as a result of the gunshot wound. On October 5, 1986, defendant was arrested for the shooting, and on October 31, 1986, he was indicted for the offense of murder.

On September 14, 1987, defendant filed a *pro se* petition asking that a lawyer, other than from the public defender's office, be appointed to represent him. In his motion, defendant averred that his assistant public defender had told him that the public defender's office did not have the necessary time and resources to investigate all the circumstances of the case. Defendant also alleged that his public defender had refused to have gunshot residue tests performed on his car and refused to interview any of the State's witnesses.

In response to defendant's allegation that his public defender told him that he did not have the necessary resources or time, the assistant public defender stated that defendant was lying. He did, however, admit that he had not had the gunshot residue tests performed on the car, but stated that this was part of his trial strategy. He also acknowledged that he had not interviewed any of the State's witnesses, but he stated that he would interview the five witnesses sometime before trial. When asked by the court for an explanation, defense counsel stated that he may have avoided defendant because he found him "troublesome" and "quarrelsome" and did not get along with him. The court ordered the public defender to interview the witnesses as soon as possible and report back on October 5, 1987.

On October 5, 1987, the court was advised that the public defender had attempted to locate and speak to four of the witnesses, but three had moved and one had refused to speak with him. The court allowed another continuance in order to get updated addresses.

On January 27, 1988, immediately before jury selection began, defense counsel asked the court if he could be allowed to interview some of the State's witnesses. He reminded the court of his earlier unsuccessful attempts and the State agreed to give defense counsel access to the witnesses before trial.

During *voir dire*, the court gave defense counsel the opportunity to ask questions of prospective jurors. In response to one of defense counsel's questions, Mary Schmack stated that although she would be a fair juror, she would be distracted during the trial because she was in the middle of moving her office. The circuit court refused to excuse her for cause, stating that defense counsel was responsible for answers he received as a result of his open-ended question. Consequently, defense counsel used a peremptory challenge to exclude Schmack.

Another prospective juror, Carla Woodard, stated she would be unable to be a fair juror because she had an aversion to guns. Defense counsel requested a sidebar, but the court refused to grant one. Counsel then attempted to excuse Woodard for cause, but the prosecutor reminded counsel that the challenge was not for cause; consequently, defense counsel used another peremptory challenge to exclude Woodard.

Finally, one of the prospective jurors, Joseph Gajewski, stated that he could not be a fair juror because he was going to close on a mortgage soon. During a sidebar, the court refused to exclude him for cause and defense counsel had to use another peremptory challenge to exclude Gajewski. By the end of jury selection, the defense had used all its peremptory challenges.

On January 28, 1988, trial began. The evidence adduced at trial showed the following. On October 4, 1986, Rachelle Garcia, who had known defendant for approximately three years, asked him if she could hold a birthday party for Desiree Sams and Roxanne Ivy at his home. Defendant agreed and allowed Rachelle to use the small house located near Archer and Lowe in Chicago where defendant was staying with a friend.

At approximately 4 p.m. on October 4, 1986, Rachelle and Desiree arrived at the house. Roxanne arrived approximately two hours later, and Rachelle left at this time to pick up more people. While Desiree and Roxanne were alone with defendant in the house, he pulled out a large, dark gun from under a bed in the front room and showed it to them. They told him to put it away; defendant then took the gun into the back of the house near the kitchen. After putting the gun away, defendant offered Desiree and Roxanne some cocaine and marijuana; both "snorted" several "lines" of cocaine with defendant.

During the evening, between 25 to 30 people arrived at the party, most of them teenagers. Several of those teenagers were drinking beer, smoking marijuana, and using cocaine. During the party, defendant also used cocaine and offered marijuana and cocaine to several teenagers.

Later in the evening, while defendant was in the kitchen with several other people, he accused Mike Fredricson of stealing $40 from him and he pointed his gun at him. Rachelle tried to calm defendant and told him to put the gun away. Less than one hour later, defendant put the gun to Rachelle's head and pulled the trigger; the gun clicked, but did not fire, and defendant laughed.

The party continued throughout the night, and at about 3 a.m., only seven people remained in the house with defendant: Rachelle, Desiree, Roxanne, Mark Cleveland, Tim Eskra, Laura Baker, and Tom Biggs. At Rachelle's request, defendant agreed to drive everyone home. Everyone then left the house and got into defendant's car, except for Tom Biggs, who said he wanted to walk home. Mark Cleveland left the car to join Tom, and they began to walk north towards Archer.

Defendant drove his car towards the two boys and stopped; he yelled at Tom to "get the fuck away" from the house and Tom yelled back, "[F]uck you, I'm leaving." Defendant then pulled a gun from under the driver's seat, pointed it at Tom, and fired a shot. The shot did not hit Tom, and defendant repeated his statement to "get the fuck away"; Tom responded to him in the same manner as before and defendant shot at Tom again, missing him. After this second shot, Tom left the curb, walked towards defendant's car, took off his jacket and threw it on the street, put his hands on his hips, and said "[G]o for it." Defendant then aimed his gun at Tom and fired from a distance of only a few feet, hitting Tom in the forehead. After Tom fell, defendant put the car in reverse and everyone but Tim and Roxanne was able to jump out of the car before defendant drove away.

After shooting Tom, defendant drove to a steel girder bridge located on Canal Street, where he stopped, got out of the car, and threw the gun into the river below. Defendant then returned to his car and drove back across the bridge; as he was driving, defendant threw baggies of pills and cocaine out of the car.

In the meantime, after defendant drove away from the shooting, the teenagers who had jumped out of his car attempted to help Tom. They tried to stop several cars but were unsuccessful in obtaining help; Desiree, however, was able to stop a CTA bus and urged the driver to call for help. At this time, Sherie Savikas, who had left the party hours earlier, drove by and attempted to help the others.

It was at about this time that defendant, Roxanne, and Tim returned to the house. Roxanne went to join the group of people trying to help Tom, and defendant went inside his house.

Several of the teenagers were able to put Tom in Sherie's car and they then drove to Mercy Hospital. After taking Tom to the hospital, the group in Sherie's car drove to find Tom's mother and sister. They then drove back to defendant's house, spoke with the police who had arrived at the scene, and went to the police station.

Officer Frances O'Donnell was at the scene when the teenagers in Sherie's car arrived. After speaking with the teenagers and telling them to go to the police station, she and Roxanne drove to the bridge from which defendant had thrown the gun. O'Donnell was unable to recover the gun, however, because the area by the bridge had very steep banks and a swift current.

After 11 witnesses, the prosecution rested. Defendant then testified in his own behalf.

Defendant stated that on October 4, 1986, he was living with a friend in the friend's house on Lowe Street. Because defendant had been the victim of a shooting, he kept a gun in the house.

On October 4, 1986, defendant agreed to host a party for his friends Rachelle and Desiree. After Rachelle and Desiree arrived at his house, but before any guests came over, defendant moved his gun from the front room to the back of the house. He did not, however, show the gun to the girls or point it at them. As more guests arrived at the party, people began to smoke pot, drink beer, and snort cocaine; however, defendant neither provided, nor used, any of the alcohol or drugs at the party.

During the party, defendant had two arguments with one of the guests at the party. At around midnight, defendant suspected that Mike Fredricson had stolen $40 and he warned him to stay out of trouble; he did not, however, point his gun at Mike, but did pull his gun out when he saw Mike reach in his pocket for a knife. Defendant then put his gun into his belt and did not pull it out again, although one hour later, he accused Mike of stealing Desiree's purse. After that accusation, he asked Mike to leave the party.

At around 3:45 a.m., defendant told everyone that the party was over and everyone left except Rachelle, Roxanne, Desiree, Tim, Mark, and Tom. Defendant agreed to drive this group home. As he left his home, defendant threw his gun under the steps. Everyone then got into his car except for Tom, who said the car was too crowded. Mark left the car to walk with Tom, and the two walked to the corner. Defendant drove to the corner and yelled to the boys, "[W]hat are you doing on the corner?" and told them to leave the area. Tom started swearing at defendant and

defendant heard four loud bangs which he thought came from the expressway above. When Tom fell, however, defendant realized that someone had shot him. Because defendant thought someone was trying to shoot him, but had hit Tom instead, he drove away.

After leaving the scene of the shooting, defendant drove to a bridge, left the car, and urinated. Defendant then drove back to the house and asked the group of people there whether anyone had called for help. When they answered "no," he went into his house and attempted to call 911 three times, but he was unable to get through. He then decided to drive to the police station to report the shooting, but was stopped and arrested on his way there.

During cross-examination, the prosecutor asked defendant if his wife had shot him previously because he had been having sex with his child. The defense objected, and the court sustained the objection and admonished the jury to disregard the prosecutor's question.

After defendant testified, defense counsel motioned for a mistrial based upon the prosecutor's question because it involved allegations of prior criminal conduct and was highly prejudicial. The court found that the question was inappropriate; however, it did not grant the mistrial, because it felt that its admonishment to the jury was "strong and heavy." Moreover, the court was not certain that the jury had even heard the remark because several deputies, when asked by the court during a subsequent break, stated that they had not heard the remark.

The defense rested, and in rebuttal, the State called Assistant State's Attorney John Muldoon, who had interviewed defendant after his arrest. Muldoon testified that defendant told him that he was driving some girls home after the party when one of the girls needed to go back for something she had forgotten. When defendant returned to the house for the forgotten item, Tom was lying in the street. Defendant also told Muldoon that he had had a toy gun at the party.

During closing argument, several objections by the defense were sustained when the prosecutor stated that the State's witnesses had told the police the same story that they were telling at trial. The court admonished the jury to disregard those remarks.

After trial, the jury returned a verdict of guilty of murder, judgment was entered on the verdict, and defendant was subsequently sentenced to 40 years in the Illinois Department of Corrections.

## I

Defendant initially contends that because his trial counsel was burdened with a conflict of interest, he was denied effective assistance of counsel. Specifically, defendant argues that his trial counsel avoided him,

refused to interview witnesses, and found him "quarrelsome" and "troublesome." Thus, defendant maintains, there was an actual conflict of interest between defense counsel and defendant. *United States ex rel. Bradley v. Lane* (7th Cir. 1987), 834 F.2d 645, 650.

■ A claim that an actual conflict of interest prevented trial counsel from rendering effective assistance of counsel must raise issues or circumstances of constitutional dimension. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *United States ex rel. Bradley v. Lane* (7th Cir. 1987), 834 F.2d 645, 650.) To obtain a new trial, defendant must show both a deficiency in counsel's performance and prejudice resulting therefrom. *People v. Weir* (1986), 111 Ill. 2d 334, 337, 490 N.E.2d 1, citing *Strickland v. Washington*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

■ Defendant's assertion that his personal relationship with trial counsel led to an unfair result has no support in the record. Defendant relies upon several statements made by the public defender prior to trial which he asserts constitute a conflict of interest. Prior to trial, the public defender stated that he had not interviewed the State's witnesses, but that he was planning to do so sometime before trial; he did not have gunshot residue tests performed on defendant's car as a matter of trial strategy; and he may have avoided defendant because he found him "quarrelsome" and "troublesome." Taken in their totality, these circumstances do not constitute a conflict of interest on the part of trial counsel. See *United States ex rel. Bradley v. Lane* (7th Cir. 1987), 834 F.2d 645.

■ Moreover, even if trial counsel's performance could somehow be shown to have been deficient (which defendant has failed to do), no prejudice resulted from any alleged conflict of interest. Defense counsel successfully argued motions *in limine*, successfully challenged prospective jurors, and made numerous objections during trial. Furthermore, the record does not reflect that the result of the trial would have been any different with different representation. (See *People v. Schmidt* (1988), 168 Ill. App. 3d 873, 522 N.E.2d 1317.) Thus, defendant was not denied effective assistance of counsel.

## II

Defendant next argues that he was denied a fair trial because he was forced to exercise all the peremptory challenges to which he was entitled. Specifically, defendant maintains that the circuit court improperly refused to excuse for cause three jurors; consequently, he was forced to use his peremptory challenges to excuse those jurors.

■ ■ The Supreme Court has held that peremptory challenges are not of constitutional dimension; rather, they are creatures of State law

and a State may determine their number, purpose, and manner of exercise. (*Ross v. Oklahoma* (1988), 487 U.S. 81, 88, 101 L. Ed. 2d 80, 90, 108 S. Ct. 2273, 2278.) In Illinois, the circuit court is afforded broad discretion in *voir dire*. (*People v. Johnson* (1987), 162 Ill. App. 3d 952, 953, 516 N.E.2d 343.) Reversal of a conviction will not occur unless there has been an abuse of discretion which denies a defendant an impartial trial. (*People v. Johnson*, 162 Ill. App. 3d at 953.) Moreover, the circuit court's determination of whether prospective jurors would be fair and impartial should not be set aside unless that determination was contrary to the manifest weight of the evidence. *People v. Pecina* (1985), 132 Ill. App. 3d 948, 954, 477 N.E.2d 811.

In the instant case, defendant does not argue that the empaneled jury was not fair or impartial. Moreover, defendant did not challenge for cause any of the veniremen who eventually sat as jurors. Although defendant argues that by being "forced" to use three peremptory challenges he was denied a fair trial, he offers no cases which support this contention. The cases he does cite support a different conclusion: *People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705 (where the court held that a jury member, who stated during *voir dire* that he knew the victim, a witness, and the attorneys, was an impartial juror); *People v. Jarosiewicz* (1977), 55 Ill. App. 3d 1057, 371 N.E.2d 949 (where the court held that a venireman was properly found impartial even though he did not believe that a police officer could commit an unprovoked act of violence).

■ Although there are instances where a jury may be tainted by the inclusion of a venireman who states that he cannot be fair or impartial, reversible error results not from the defendant's exhaustion of his peremptory challenges, but rather from the end result of an unfair jury. (See *Ross v. Oklahoma* (1988), 487 U.S. 81, 88, 101 L. Ed. 2d 80, 90, 108 S. Ct. 2273, 2278.) Because defendant was not burdened with an unfair and partial jury, he was not denied a fair trial based solely upon his exhaustion of his peremptory challenges.

### III

Defendant next contends that he was denied a fair trial by the prosecutor's improper comments during trial. Specifically, defendant complains about (1) the State's asking a witness if she knew about defendant giving cocaine to all the little kids in the neighborhood, and (2) the State's asking defendant if he had been previously shot by his wife for having sex with his child. In addition, defendant argues that certain remarks made by the prosecutor during closing argument were not supported by the evidence. Moreover, defendant maintains that the circuit court erred in conducting an improper investigation.

■ The mere occurrence of what may be improper remarks does not mandate reversal. (*People v. Thomas* (1990), 137 Ill. 2d 500, 561 N.E.2d 57; *People v. Moody* (1990), 199 Ill. App. 3d 455, 557 N.E.2d 335.) Even several statements, complained of as error, do not deny a defendant a fair trial where the jury is admonished that the statements are not evidence and that they are to be disregarded. (*People v. Thomas*, 137 Ill. 2d at 530.) Timely objection by defense counsel and an admonishment by the court will prevent error or render errors harmless, in the event that they occur. *People v. Moody*, 199 Ill. App. 3d at 466.

We recognize that the prosecutor's question whether defendant gave cocaine to "all the little kids in the neighborhood" stemmed from the testimony at trial which established that defendant provided cocaine to the teenagers at the party. We also recognize that the prosecutor asked defendant if he was shot by his wife because defendant's testimony established that he kept a gun in the house because he had been shot prior to the incident at bar. These questions, however, far exceeded any proper inquiry and were not supported by the evidence; moreover, both questions were improperly suggestive of other crimes.

The prosecutor's questions concerning defendant's alleged sexual activity with his child and giving cocaine to "kids" were clearly egregious examples of prosecutorial misconduct. Although objections were made and sustained, the impact that these types of comments have upon a trial cannot be overlooked. We have difficulty understanding why a prosecutor would jeopardize an otherwise fair trial with such prejudicial comments. Were it not for the fact that the evidence overwhelmingly favored conviction, we would unhesitatingly reverse and remand this case for a new trial.

However, the court promptly sustained objections to each complained-of question, struck it, and instructed the jury to disregard it. The court also promptly sustained objections to, and instructed the jury to disregard, the prosecutor's argument that the State's witnesses had told the police the same story they had told at trial. Moreover, the court gave the jury a written instruction to disregard testimony that the court had stricken and to ignore and disregard arguments not based upon the evidence at trial.

■ Notwithstanding the impropriety of the prosecutor's remarks, it cannot be said that they resulted in substantial prejudice to defendant. (*People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 431 N.E.2d 1154.) To merit reversal, a prosecutor's improper remarks must be of "substantial magnitude" when viewed in the context of the entire record. *People v. Scott* (1990), 194 Ill. App. 3d 634, 551 N.E.2d 288.

■ In light of the overwhelming evidence of defendant's guilt in this case, the prosecutor's improper remarks cannot be said to have constituted a material factor in his conviction. The absence of the improper remarks certainly would not have resulted in a different verdict. (See *People v. Faysom* (1985), 131 Ill. App. 3d 517, 475 N.E.2d 945.) Moreover, any error was harmless, particularly in light of the court's admonishment and subsequent jury instruction to disregard any remarks stricken from the record. *People v. Moody* (1990), 199 Ill. App. 3d 455, 557 N.E.2d 335.

Defendant also argues that the court improperly denied his motion for a mistrial because the court based its ruling on its own independent investigation. Defendant relies upon the court's statement that it queried a number of courtroom deputy sheriffs during the lunch hour and they told the court that they hadn't heard the remark made by the prosecutor concerning defendant having sex with his child. Consequently, the court wrongfully assumed that the jury had also not heard the remark.

■ Although a defendant may be denied due process of law when the circuit court makes a decision based upon a private investigation (*People v. Harris* (1974), 57 Ill. 2d 228, 314 N.E.2d 465), the error, even of constitutional dimension, is rendered harmless if the evidence overwhelmingly favors conviction. *People v. Lee* (1987), 162 Ill. App. 3d 972, 516 N.E.2d 360.

■ In the instant case, it does not appear that the court's "investigation" infringed upon defendant's constitutional rights. After the prosecutor's remark about defendant's sexual abuse of his daughter, the court effectively cured any error by strongly admonishing the jury to disregard those remarks because they were "totally irrelevant and unproven, and unestablished." The court further stated during the hearing on defendant's motion for a mistrial: "I really think my response [to the jury] was strong and heavy, two or three or four different admonishments to the jury." The complained-of "investigation" by the court occurred only after the remarks were stricken and admonishments made. Because those admonishments cured any error, the court's inquiry did not infringe upon defendant's constitutional rights. *People v. Lee*, 162 Ill. App. 3d 972.

## IV

Defendant finally contends that the circuit court improperly sentenced him to 40 years in the Illinois Department of Corrections. Specifically, defendant argues that the court erroneously believed that he was eligible for an extended term and, thus, his sentence must be reversed and remanded.

Defendant bases his contention upon the court's statement:

"I don't feel that an extended term should be applied *** because of the health situation of the defendant and because any substantial sentence is *** a death sentence on this defendant."

Defendant interprets this statement as meaning that the court was under the mistaken impression that an extended sentence could be imposed and was thus improperly influenced by this belief.

Although defendant cites *People v. Marquis* (1977), 54 Ill. App. 3d 209, 369 N.E.2d 372, and *People v. Hargis* (1983), 118 Ill. App. 3d 1064, 456 N.E.2d 250, neither of these cases is persuasive. The circuit court in *Marquis* was under the mistaken belief that the defendant's crime was a Class A misdemeanor when it was actually a Class B misdemeanor. (*People v. Marquis*, 54 Ill. App. 3d at 214.) In *Hargis*, the circuit court thought that a death sentence was within its discretion when, in fact, the maximum sentence was life. (*People v. Hargis*, 118 Ill. App. 3d at 1081.) Neither of these cases applies in the instant case because here, the sentencing was not pursuant to an incorrect offense classification nor was any error made as to the maximum sentence allowed by law.

A sentencing decision is a matter within the sound discretion of the court and will not be disturbed absent an abuse of discretion. (*People v. Ward* (1986), 113 Ill. 2d 516, 499 N.E.2d 422; *People v. Escobar* (1988), 168 Ill. App. 3d 30, 46, 522 N.E.2d 191; see also *People v. Kindelan* (1986), 150 Ill. App. 3d 818, 502 N.E.2d 422 (where a 40-year sentence was not excessive after the trial court denied the State's request for an extended term).) Because the circuit court bases its sentence upon the particular facts of each case, it is normally in a better position to determine the appropriate punishment. *People v. Escobar*, 168 Ill. App. 3d at 46.

In the instant case, the court, after considering evidence in mitigation and aggravation, specifically chose not to sentence defendant to an extended term. The record does not reflect that the circuit court abused its discretion in sentencing defendant to the maximum allowed by statute. Thus, there is no basis upon which to reverse defendant's sentence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SCARIANO, P.J., and HARTMAN, J., concur.