THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ZEHRA ROWJEE, Defendant-Appellant.

First District (6th Division)   No. 1—98—0496

---

Opinion filed September 30, 1999.

Quinlan & Crisham, Ltd., of Chicago (Gino L. DiVito and Michael A. Steigmann, of counsel), for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and William L. Browers and Courtney D. Carter, Assistant Attorneys General, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant psychiatrist Dr. Zehra Rowjee was found guilty of vendor fraud and theft against the Illinois Department of Public Aid in excess of $10,000. The trial court sentenced defendant to six months of imprisonment in the Cook County Department of Corrections, restitution of $10,000, 48 days of community service, and 30 months of probation. Defendant now appeals her conviction and sentence.

The record on appeal indicates the following facts. The parties stipulated that during the period from 1991 through 1993, the State of Illinois issued defendant 29 checks totalling $58,924.20 in payment of public aid vouchers submitted by defendant for treatment of indigent patients.

Zainab Akbari, defendant's sister, testified that during the time period at issue, she was employed by defendant part time to answer the telephone and prepare bills at defendant's private office. Akbari's duties included submitting bills to the Illinois Department of Public

Aid. Akbari testified that defendant saw patients at the office and also saw patients at Lutheran General Hospital on an inpatient basis.

Akbari also testified that on her desk was a sheet of paper for each month, listing patients and dates. According to Akbari, every time defendant saw a patient at the hospital, defendant would return to the office and circle that date, so that Akbari would know defendant had seen the patient that day. Akbari further testified that, in her experience, defendant would make entries to the charts 99% of the time when she saw patients.

Illinois State Police Sergeant Cleotha Jones testified that, in April 1994, he was assigned to the medicaid fraud control unit. On April 24, 1994, Sergeant Jones interviewed defendant at her home. Sergeant Jones informed defendant that he had talked to several of her public aid patients, for whom she had billed on a daily basis, and that the patients had said that they had not been treated on a daily basis.

According to Sergeant Jones, defendant asked what would happen if she had billed for services she had not provided. Sergeant Jones responded that it would be up to the Illinois Attorney General. Defendant then asked whether it would be possible to get probation if she paid the money back. Sergeant Jones responded that before it could be determined what the Illinois Attorney General would do with the case, she would have to say how she falsely billed the Department of Public Aid. According to Sergeant Jones, defendant gave an example where, in a seven-day period, she might bill for five days when she had not seen the patient on two of those days.

Sergeant Jones then identified People's exhibits IV1 through IV29 as public aid billing documents or invoices prepared in defendant's name. Sergeant Jones also identified People's exhibit S-1 as a schedule for some of defendant's public aid billing, containing patient names and identification numbers, service dates, amounts billed, procedure codes, amounts paid, voucher numbers and document control numbers. Sergeant Jones testified that exhibits IV1 through IV29 appeared in People's exhibit S-1.

Sergeant Jones stated that he "had a hand" in the creation of People's exhibit S-1. Sergeant Jones testified that he went through a computer printout of defendant's public aid billing, then went through defendant's patient files from Lutheran General Hospital, looking for dates where there was no entry. People's exhibit S-1 purports to list days where defendant billed where there was no matching documentation by defendant in the patient's chart. Sergeant Jones could offer only a layman's assessment as to whether particular handwriting was that of defendant. The record on appeal contains People's exhibit S-1, which shows a total "variance" of $19,239.55.

On cross-examination, Sergeant Jones testified that defendant was shown a computer-generated list of defendant's public aid billing. Defendant was not able to identify particular patients or dates where false billing may have occurred or any specific amount of false billing. In addition, Sergeant Jones testified that he did not tell defendant during their conversation that this was a criminal investigation.

The State also called three of defendant's former psychiatric patients. Each testified that defendant had not seen them on particular occasions. However, each of the former patients also testified that he or she could not remember various facts relating to his or her treatment by defendant. For example, one patient testified that he could not remember telling defendant certain personal facts about himself that had been entered into his patient file by defendant.

Nurse Barry Coleman testified that he had occasion to work with defendant at Lutheran General Hospital during the time period at issue. Coleman worked the night shift for at least part of 1991. Based on a familiarity with defendant's work habits, Coleman estimated that when defendant saw a patient, defendant would put a note on that patient's chart "probably over 90 percent of the time." Coleman did not know whether defendant had a responsibility to chart a patient on a daily basis if the patient's condition had not changed.

The State's exhibits were admitted into evidence. The State then rested. Defendant moved for a finding in her favor, which the trial court denied.

Defendant called registered nurse Sally McCarthy as a witness. Like nurse Coleman, nurse McCarthy had worked with defendant at Lutheran General Hospital during the time period at issue, but primarily on the day shift. McCarthy testified that she would see defendant interacting with patients at the hospital between three and five times weekly.

McCarthy stated that therapy would be routinely noted on a patient's chart. McCarthy added that sometimes it was difficult to find a patient's chart, due to factors like the patient's participation in group therapy or medical testing performed outside the psychiatric unit. McCarthy estimated that a chart might not be available "[a] good 30 percent of the time."

McCarthy stated that when a patient's chart was not available, a verbal order for things such as a change in medication or a request for restraints would be noted and eventually attached to the patient's chart. The transcript later contains the following exchange:

> "Q. In instances in the 30 percent of the time when the chart is not present. I think you've indicated what occurs is the patient is later placed on the chart?

A. Uh-huh. The only exception I could think of is if a patient is on suicide watch or in restraints. By law you have to document every 15 minutes or whatever. And we usually have a clipboard with sheets of each patient on that watch, and you would find out where the patient was and you would chart with doctor, or in day room, or watching T.V. These were pieces of paper which were later added to the chart."

McCarthy also testified that no doctor would wait around for an hour after treatment for a chart.

Defendant testified on her own behalf, denying that she ever intentionally billed the Illinois Department of Public Aid for services not rendered. Defendant discussed defendant's exhibit 6, which was her hospital visit record, normally kept in her office, which purported to note the dates on which she rendered services to patients at Lutheran General Hospital for the time period at issue. Defendant also discussed defendant's exhibit 7, which defendant testified resulted from her efforts to determine from documentation of other patients whether she had made rounds at the hospital on the dates identified by the State in its exhibit S-1. Defendant's exhibits 6 and 7 were admitted into evidence over the State's objection. Defendant has not noted where her exhibits 6 and 7 appear in the record on appeal.

Defendant also testified regarding the recording of patient information. For example, the transcript contains this exchange:

"Q. Were you able to chart or write something in your own handwriting on a daily basis when you were visiting with these patients for the purpose of performing your services?

A. Yes, I did.

Q. Were you able to do that every single time that you saw the patients?

A. Yes. Not one but two, three places doctors orders, progress notes, lab results, I would initial."

However, the transcript later contains the following exchange:

"THE COURT: Do you understand the questions that [defense counsel] Mr. Rimland asked you?

THE WITNESS: He asked me if I documented every time I say [*sic*] the patient.

THE COURT: And what did you answer.

THE WITNESS: Yes. I said not one but two, three places if the chart is available.

THE COURT: That's not what she said. Go on Mr. Rimland."

Defendant also testified specifically about three patients listed in People's exhibit S-1. Defendant reviewed the hospital records and determined which days she had made notes for these patients at some place in each file. Defendant testified that her handwriting appears in

two of the files on at least seven of the dates identified in People's exhibit S-1.

Defendant added that she told Sergeant Jones that there could have been days when she mistakenly billed for services not rendered. Defendant testified that there were no more than 10 to 12 times where this could have happened over three years.

Defendant further testified that she billed for services ostensibly rendered from June 12 to June 20, 1993, when she was actually on vacation. Defendant explained that she had another doctor "cover" for her while she was on vacation and she would get the records from that doctor when she returned, bill for the services and pay the funds received to the second doctor. Defendant testified that it was easier billing that way.

Following questioning by the parties, the trial judge questioned defendant about her recollection of diagnoses of patients that had been discussed on direct examination. The trial judge then questioned defendant about two patients that were hospitalized in April 1996—patients who were not listed in the State's exhibit S-1. The trial court asked for the discharge date of one patient and the services provided to him on the day before he was discharged.

The trial court also asked whether defendant would be able to recall what services were provided on a given day without writing in the patient's progress notes. Defendant responded that she would remember the clinical condition, as it did not change much from day to day. The trial court quizzed defendant on her birth date, her daughter's birth date, and her office hours on different days of the week. The trial court further asked whether defendant remembered visiting the hospital on Christmas or New Year's day in various years.

The trial court directed the State to subpoena the records for the two patients defendant mentioned as being hospitalized in April 1996. The prosecutor noted that the State might need a court order if the patients were not public aid patients, to which the trial court replied, "You got it." The trial court stated that it would draft an order directing the hospital to provide the records directly to the trial court. This transcript is dated June 26, 1997.

On August 25, 1997, Jennifer Sheridan, the records custodian for Lutheran General Hospital, produced one of the patient files directly to the trial judge. On September 10, 1997, Sheridan produced the second patient file to the trial judge. The trial court reviewed both files and returned them to Sheridan; neither the State nor defense counsel reviewed these files. In the September 10, 1997, transcript of proceedings, the trial court states that the files were reviewed for the single purpose of testing the independent recollection of a witness.

The trial court subsequently found defendant guilty of vendor fraud and theft. The transcript of proceedings shows that the trial court based its conclusion largely on the People's exhibit S-1 and the defendant's own statements and testimony. The trial court sentenced defendant to six months of imprisonment in the Cook County Department of Corrections, restitution of $10,000, 48 days of community service, and 30 months of probation. Defendant immediately tendered a $10,000 check for restitution. The trial court denied defendant's motions for a new trial and to reduce the sentence; this appeal followed.

■ Defendant contends that the trial court violated her due process rights by conducting a private investigation of the case. In a bench trial, the judge in deliberating is limited to the trial record, and should he or she draw conclusions based on any private investigation made by him or her, the accused will have been denied due process of law. *People v. Smith*, 176 Ill. 2d 217, 237-38, 680 N.E.2d 291, 304 (1997). If a defendant is not told of the facts of which the court is taking notice, she does not know upon what evidence she is being convicted and is unable to dispute the truth of the facts allegedly relied upon or challenge inferences drawn therefrom. See *Smith*, 176 Ill. 2d at 238, 680 N.E.2d at 304.

■ The State argues that defendant waived this claim by failing to object at trial or in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988). Yet the State concedes that the "application of the waiver rule is less rigid where the basis for the objection is the trial judge's conduct." *People v. Nevitt*, 135 Ill. 2d 423, 455, 553 N.E.2d 368, 381 (1990). The State's concession is a welcome one. In a criminal prosecution, an assistant Attorney General, no less than an assistant State's Attorney, is the representative of all the people, including the defendant, and it is as much his or her duty to safeguard the constitutional rights of the defendant as those of any other citizen. See *People v. Lyles*, 106 Ill. 2d 373, 411-12, 478 N.E.2d 291, 308 (1985). The State, while noting a potential problem in carrying out the trial judge's order, did not object to the trial judge directing the issuance of a subpoena for additional patient files. The reluctance on the part of the defense and the prosecution to challenge the authority of the trial judge is understandable and one of the reasons for the relaxation of the waiver rule.

■ The State also responds that there is no indication that the trial court relied on the patient files that it ordered the State to subpoena. "The rule is clear that when the trial court is the trier of the facts every presumption will be accorded that the judge considered only admissible evidence and disregarded inadmissible evidence in reaching his conclusion." *People v. Wallenberg*, 24 Ill. 2d 350, 354, 181

N.E.2d 143, 145 (1962). Nevertheless, where the trial judge's statements in the record show that he or she considered matters which were not in evidence, this presumption is rebutted. *Wallenberg*, 24 Ill. 2d at 354, 181 N.E.2d at 145.

■ In this case, the transcript of proceedings shows that the trial court not only questioned the defendant at length about patients who were not mentioned in the State's case, but also expressly stated that his request to review the files for those patients was for "the singular and express purpose of testing a witness's independent recollection." The trial court also referred to its assessment of defendant's credibility during the sentencing hearing. In *People v. McMiller*, 410 Ill. 338, 102 N.E.2d 128 (1951), our supreme court held that where the trial judge made statements at a sentencing hearing suggesting that he had conducted a private investigation, it was reversible error, despite the fact that it was "impossible to determine from the record the extent of such investigation or how much the judge was influenced by reason of his inquiry." *McMiller*, 410 Ill. at 342, 102 N.E.2d at 130. This is not a case where the trial judge stated that he was not discounting testimony based on matters *dehors* the record and made only a passing reference to such matters. See *People v. Martin*, 285 Ill. App. 3d 623, 635, 674 N.E.2d 90, 98 (1996). Rather, this is a case where the trial judge directed the prosecution to subpoena patient files, stated that he would enter orders necessary to overcome any confidentiality of files of persons not receiving public aid, delayed the trial for weeks until the files were produced, and stated that he was reviewing the files to determine witness credibility. Accordingly, the presumption is rebutted in this case.

The State further argues that the error is harmless because it could not have reasonably affected the verdict of the trial or denied defendant due process of law. While conceding that the trial court erred, the State's brief devotes a mere three sentences to the harmless error argument and cites only one authority, *People v. Sherrod*, 220 Ill. App. 3d 429, 433, 581 N.E.2d 53, 56 (1991)—a case already cited in defendant's brief. *Sherrod* is merely a statement of the plain error rule and factually inapposite to this case.

As noted above and admitted by the State in its brief, a trial judge's private investigation of a case clearly implicates the accused's right to due process of law. Thus, the plain error rule applies. The question remains as to whether the error in this case was harmless. The State's brief asserts that the error is harmless in a single sentence, without any citation to authority. Where constitutional error is at issue, as it is here, the harmless-error standard set forth in *Chapman v. State*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), shifts to the State the

burden of proving "beyond a reasonable doubt" that the error did not affect a given decision. *People v. Simms*, 121 Ill. 2d 259, 275-76, 520 N.E.2d 308, 315 (1988).

There have been cases where the State has been able to meet this standard, even where the defendant claimed that the trial judge engaged in a private investigation. See *People v. Gleash*, 209 Ill. App. 3d 598, 609, 568 N.E.2d 348, 355 (1991). However, *Gleash* involved a jury trial where the trial judge had sustained an objection to an improper comment during oral argument and admonished the jury to ignore it; after the verdict, the judge had asked the bailiff whether he thought the jury had heard the improper comment. In contrast, the trial judge in this case was the trier of fact, engaged in extensive cross-examination of the defendant that included patients not at issue in this case and then ordered the production of the files for these additional patients to test the credibility of defendant's testimony.

Illinois courts have not hesitated to reverse a conviction where it was impossible to determine whether improper evidence affected the trier of fact's decision. *Simms*, 121 Ill. 2d at 275-76, 520 N.E.2d at 315. In this case, the trial court examined the additional patient files without disclosure of their contents to either the State or the defense. The trial court later commented on the defendant's credibility during the sentencing hearing.

In sum, the record shows that the secret evidence taken by the trial judge—evidence unavailable to the parties and this court—probably affected the trial court's sentencing decision and raises grave doubts regarding the verdict as well. Thus, this court cannot agree with the State's unsupported assertion that the trial court's error was harmless in this case.

Defendant argues that the trial court's error in conducting a private investigation should result in a complete reversal of defendant's conviction, without remanding the case for a new trial. Pursuant to *People v. Taylor*, 76 Ill. 2d 289, 391 N.E.2d 366 (1979), we have reviewed the evidence and find that it was sufficient to prove defendant's guilt beyond a reasonable doubt. Therefore, double jeopardy principles do not bar a retrial, although this in no way constitutes a holding that is binding on retrial. Because of our disposition of this issue, we need not reach defendant's contention that the trial court erred in convicting her of both vendor fraud and theft in excess of $10,000 under the "one act, one crime" doctrine. *E.g., People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977); *People v. Powell*, 199 Ill. App. 3d 291, 293, 556 N.E.2d 896, 897 (1990). Nor do we need to address defendant's appeal of her sentence. However, given that this case is being reversed based on the trial judge's private investigation,

on remand it should be tried before a different judge. See, *e.g.*, *People v. Sumner*, 40 Ill. App. 3d 832, 354 N.E.2d 18 (1976).

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is reversed, and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

BUCKLEY and O'BRIEN, JJ., concur.