THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL E. WOODROME, Defendant-Appellant.

Fifth District   No. 5—91—0227

Opinion filed November 25, 1992.

222

Daniel M. Kirwan and Stanley P. Stasiulis, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

Michael Woodrome was convicted by a jury of first-degree murder and concealment of the homicidal death of Audie Wilson. He was sentenced to 50 years' imprisonment on the murder, to run consecutively to five years' imprisonment on the concealment of a homicidal death. Woodrome appeals. We affirm.

Paul Conklin testified that he and Audie Wilson, who are both 21 years old, went to a party at Bill and Sue Sturgill's house on April 8, 1990. The party was outside at the Sturgill residence. People at the party were drinking beer by a bonfire. Conklin was at the party for approximately 45 minutes, and while there someone pointed a gun at him, pulled the hammer back, and told him to run. Conklin did not know it at the time, but there were no shells in the gun. Conklin did not know the person who pointed the gun, but he testified that it was not Michael Woodrome. Conklin left the party and went next door to his cousin's home. Later Conklin returned to the party, but he did not stay because no one was outside by the bonfire and he could hear Bill and Sue Sturgill arguing.

Four other persons who were at the party testified. Linda Peach testified that she has known Bill Sturgill for 13 years and his wife for one year. That evening there were approximately 10 adults and Linda's four children at the party. Linda testified that the adults spent the evening outside by the bonfire drinking beer, and her children were in the house watching television. Linda does not drink or take drugs, but she testified that all of the other adults were drinking beer and a few were smoking marijuana. She saw Audie Wilson arrive at the party with Johnny Foster and Lisa Patterson.

During the early evening Linda heard screams coming from the house. Linda went inside and saw Bill and Sue Sturgill arguing. She saw Bill throw a microwave oven onto the floor. Linda did not know what they were arguing about. Linda testified that she saw Sue Sturgill flirting with Audie and just about everyone that evening. Linda testified that later in the evening she saw Woodrome drag Audie Wilson by the hair of his head out of the house and into the garage. William "Chewy" Schofield and Bill Sturgill followed them into the garage. Linda did not go into the garage. Approximately 5 or 10 minutes later Wayne Peach, her husband, went into the garage. Linda testified that Wayne has a bad temper. After Wayne went into the garage with the others, Linda heard screaming and music coming from there. Approximately 10 to 15 minutes later Linda heard Audie Wilson say, "Please, please, no more." Wayne came out of the garage and joined Linda by the bonfire. Wayne showed Linda his broken teeth from his false plate and told her that Audie Wilson hit him in the mouth. Wayne then told her that "they killed him."

Later that night, while in the house, Linda saw Woodrome rinsing off a knife in the kitchen sink. It appeared to her that there was blood on the knife. Schofield was there too. Later she saw Sue Sturgill, Bill Sturgill and Woodrome leave in a pickup truck. Linda did not see them load anything into the truck.

When the three returned, Linda and her husband were outside by the bonfire. Linda testified that Woodrome and the Sturgills pulled a large piece of wood from the truck and threw it on the bonfire. Schofield and Woodrome changed their clothes and burned clothes and rags that appeared to have blood on them. Linda and most of the others spent the night at the Sturgill residence. Linda testified that she wanted to leave, but Wayne told her not to because if she left the others might come after her. Linda left early the next morning with her children because she and the children had to go to school.

Linda and Wayne Peach's daughter, Christine, testified that there were approximately 12 to 15 people at the party that night. She did

not witness a fight that evening, but at one point she did hear screams coming from the garage. Christine testified that she could not tell if the screams were from someone in pain or from someone just yelling. "It sounded like a bunch of people yelling and someone screaming."

Susan "Sue" Sturgill testified that while she knows who Woodrome is she is not personally acquainted with him. Sue Sturgill testified that there were about four cases of beer at the party that night. At one point Woodrome, Wilson, Schofield and her husband Bill were "horseplaying" in the kitchen. Sue asked Bill to tell them to stop before anything was broken. Bill and Sue then went into the bathroom and talked for about 20 minutes. Sue testified that she did not fight with her husband that day but that they had an argument or discussion. She denied that her husband became physical or that he threw the microwave oven onto the floor. Sue testified that after they left the bathroom she went upstairs by herself for 30 minutes. She then went outside to the fire and stood by Bill. Woodrome called to Bill to come into the garage. When Bill went into the garage, Sue went into the house. Approximately 10 minutes later she saw Bill outside by the fire. Bill asked Linda to back their pickup truck into the driveway. Linda backed the truck up to the closed garage and returned to the house.

Bill and Woodrome came into the house and told Sue that they wanted her to drive them to Mascoutah to purchase cigarettes and soda. Sue did not want to make the trip, but she did because neither Bill nor Woodrome was licensed to drive. The Sturgills live approximately four miles from Mascoutah. Sue testified that just outside Mascoutah the men asked her to pull over. She did not think this unusual because she thought one of them was getting sick from the drinking activities. Sue pulled over and the men got out of the truck and retrieved something out of the truck that was bundled up in a ball. They told her to go on to Mascoutah to buy cigarettes and soda and to pick them up on her way back. She testified that she did not know what the men were doing.

When Sue picked the men up on her way back from town, she asked them what was going on and they said, "Don't worry about it, be cool, it will be cool." They then told her it was Audie Wilson's body. When the three of them returned to the party, Bill, Woodrome and Schofield asked her to get them a change of clothes. She did not see them throw anything on the bonfire except logs.

Sue Sturgill spoke with the police twice on April 12, 1990, and once on April 14, 1990. On cross-examination she admitted that she

told the police the first time they questioned her on April 12 that she did not know when Audie Wilson left the party. When asked whether she lied to the police, Sturgill testified, "No, I did not know *** I did not know there was a body back there *** I don't recall what I said to him." Sue also admitted that it was not until April 14, 1990, that she advised the police that after returning from Mascoutah she was told that a body had been dumped. When they returned home from Mascoutah she went into her house, sat in the bathroom with her face in her hands and cried. She also told the police on April 14 that she noticed there was blood on the bathroom floor but thought it could have been from a female dog that was pregnant.

When asked on cross-examination whether she ever flirted with Audie Wilson, Sue replied, "No, sir. I'm married." Sue denied that her testimony was given in an attempt to persuade the State to be lenient with her husband.

Bill Sturgill testified that he was 32 years old and that pursuant to plea negotiations with the State the first-degree murder charge against him had been reduced to second-degree murder. As part of his agreement with the State Sturgill promised to testify in this case. He testified that he had not yet been sentenced on his second-degree murder conviction.

Bill testified that he had known Audie Wilson for 3½ years. He has known Wayne Peach for 23 years, Michael Woodrome for about one year, and Schofield for approximately 1½ months. He testified that Wayne Peach, Michael Woodrome and himself were all about 10 years older than Audie Wilson. Bill saw Audie Wilson arrive at the party with Paul Conklin. Bill testified that they started with 10 cases of beer at the party and that sometime during the evening they went out to purchase more beer. By morning all the beer was gone. Bill denies smoking marijuana that night. He testified that at any one time there were no more than 12 people at the party.

Bill Sturgill testified that he was intoxicated at the party, and he does not have a clear recollection of what happened that evening. He testified, however, that while he was outside by the fire he saw Woodrome drag Audie Wilson by the hair of his head into the garage. He does not know where Schofield or Wayne Peach was at the time. He also does not know where Linda was, but her children were in the house. After Bill saw Audie being dragged into the garage, he followed Wayne into the house. Wayne showed him his broken teeth and told Bill that Audie hit him in the mouth. Approximately 30 to 35 minutes later Woodrome called Bill into the garage. Audie Wilson was lying on the floor in a pool of blood, and Woodrome was standing at

Audie's feet. Bill does not remember whether Wayne was there, but he does recall Woodrome and Schofield being there. Woodrome said to Bill, "We beat him to death."

Bill Sturgill testified that although his recollection is not clear, he remembers at one point Audie was beaten with a stick. Sturgill did not recall whether he beat Audie with the stick or whether someone else did. He testified, "I just remember seeing something going down, but I don't remember if it was me that had a stick in my hand or what, or if I seen somebody else." Bill helped load Audie Wilson's body onto the truck. Bill's wife drove Bill and Woodrome to Silver Creek, where the body was dumped. After they returned home, they burned their clothes and went to bed.

On cross-examination Sturgill testified that he did not know whether his wife flirted with Audie Wilson that evening or not. He did get into an argument with her that evening, however. Bill Sturgill also testified that on April 10, 1990, he went to Audie Wilson's mother's home and told her that he felt somewhat responsible for her son being missing. He told Audie's mother that he last saw Audie leaving the party with a girl.

Madison County Deputy Sheriff Kelly Hodges testified that on April 18, 1990, he was on patrol at 1 a.m. when he heard a radio broadcast from a police dispatcher indicating that two individuals, Woodrome and Peach, were sighted in the area by a citizen. Hodges testified that at that time Woodrome and Peach were fugitives wanted for a homicide investigation. Hodges drove his squad car near the area where the two men were reported to have been seen and observed them walking across the parking area of a service station. As Officer Hodges approached the men, they both raised their hands in the air. Hodges testified that Woodrome and Peach told him at that time, "We're the guys that you're looking for." They surrendered and told Hodges that they wanted to turn themselves in. On the drive back to the county jail Woodrome and Peach both advised Hodges that they did not commit the homicide.

Dr. Steven Nuernberger, a pathologist, testified that he performed an autopsy on Audie Wilson to determine the cause of death. Nuernberger's testimony regarding the external examination of the decedent's body provides insight into the condition of the body when it was discovered by the police.

> "The skin of the hand and feet was wrinkled, reflecting prolonged immersion under water. There was a mottling of the body. Multiple contusions were present over the anterior thorax. Some contusions on the back. There was multiple—or

there were multiple lacerations on the head and face of the deceased. The nose was broken. There was no evidence of bruises or contusions on the lower extremities of the deceased. There were two hyperkeratotic inverted palpable marks, corns—two corns on the bottom of the right foot of the deceased. On closer examination of the face there was a four-and-a-half sonometer laceration. Sonometer—centimeter is about two-and-a-half centimeters to an inch, so there was an almost two-inch long laceration at the hairline on the left forehead. There was a small laceration in the middle portion of the left eyebrow. There was a Y-shaped or T-shaped, I felt, an incised wound or a cut in the lateral left eyelid that measured about an inch. There was a tear in the right alar wing of the nose. There were bruised lips. Inside the lips the gum or the cheek, the inside cheek was torn about an inch tear on the inside cheek. The bottom part of the bottom lip was torn and the scrape—the inside mucosa of the right cheek was scraped and torn. The right eye showed a— what was felt to be a laceration in the right eyebrow, and there was a second vertical laceration or incision in the right upper lateral eyelid. The nose—I'm repeating—the nose was broken.

Examination of the neck revealed two stab wounds, one on each side of the neck. Each stab wound measured approximately 1.4 centimeters to a centimeter-and-a-half, and below that there were bruises on the chest and back.

\* \* \*

\*\*\* He had a fractured rib on his left side. I think the second rib was fractured. I think the fourth and the sixth, seventh and eight. Probably three to five fractured ribs on the left side. There was [sic] no fractured ribs on the right side."

Neurnberger testified that Audie Wilson did not die by drowning or by strangulation. Furthermore, the two stab wounds Audie Wilson received to the neck were not enough to cause his death. Wilson's death was a result of a combination of occurrences.

"I've got a potentially fatal injury to the heart, but not enough blood from it to cause death, which means he could have died before he had time to bleed out of his heart. I have pulmonary edema, which you can get with drowning or you can get with head trauma or strangulation. And I've got knife wounds to the eyes that don't hemorrhage. Time becomes the essence. In what the body taught me and what I could understand was this man had injury to the head and chest that could be fatal but wasn't. We have stab wounds to the neck that show us he was

alive but weren't fatal. We have a potentially fatal injury to his heart, but wasn't fatal because he died before it killed him. I think we are left with two possibilities, drowning and blunt trauma to head and chest with respiratory failure, pulmonary edema and death. So the time it took between when he was beat up and when he was submerged in the water is a critical interval, and I have no knowledge of how long that interval was. Okay. I believe that because the knife wounds to the eyes did hemorrhage into the tissues behind the eyeball, I believe he was dead when they occurred, and they must have occurred before he was submerged, so I'm left with death secondary to blunt trauma to the head and chest, injury to the brain."

Testimony as to blood samples taken from the Sturgill house and garage was provided by Michael Brown, a serologist with the Illinois State Police crime laboratory. Brown testified that using genetic marker analysis he should be able to either eliminate a person as being a source of the blood sample or be able to state that the blood-stain could have originated from that person. Using a statistical analysis of different blood systems, Brown is able to determine approximately how often the particular genetic marker is found in the total population.

Brown testified that he tested a blood sample taken from the outside of a container of oil found in the Sturgill garage. The test revealed that while the blood could have been from Audie Wilson, it could not have come from Woodrome, Bill Sturgill, Schofield, or Wayne Peach. The same was true of the blood samples taken from the garage floor and from the wooden table leg in the garage. Brown testified that based on his genetic marker analysis, the blood found on the container of oil could have come from 5.43% of the white population.

During the defendant's case, Lieutenant Carol Stirrup, a corrections officer with the St. Clair County sheriff's department, was called to the stand. Stirrup testified that at the request of the defense she examined Michael Woodrome, Wayne Peach, William Schofield, and Bill Sturgill for identifiable marks or tattoos. She found that Michael Woodrome has from five to seven tattoos, while Wayne Peach has approximately 35 identifiable marks or tattoos on his body. Stirrup testified that Schofield has five or six tattoos, and Bill Sturgill has seven. While Woodrome did not have any tattoos that were the same as the other three men, Lieutenant Stirrup found that Peach, Schofield and Sturgill each had a tattoo of a handgun.

The jury found Michael Woodrome guilty of the first-degree murder and concealment of the homicidal death of Audie Wilson. Defendant raises seven issues on appeal:

(1) Whether his convictions should not stand because they are based almost exclusively upon the uncorroborated testimony of an accomplice who was a liar, who admittedly could not recall much of the incident, who received favorable treatment from the prosecutor for agreeing to testify against the defendant, and whose testimony was substantially impeached.

(2) Whether the court erred in giving the instructions on accountability.

(3) Whether defendant was denied a fair trial by the prosecutor's misstatement of evidence during closing argument and by the court's failure to instruct the jury to disregard such misstatements.

(4) Whether the trial court abused its discretion by failing to grant defendant a new trial upon newly discovered evidence.

(5) Whether the issues instruction on first-degree murder was incorrect and fundamentally unfair.

(6) Whether defendant was denied the effective assistance of counsel by defense counsel's failure to object to alleged inculpatory hearsay of a nontestifying codefendant and by his failure to tender a proper issues instruction for second-degree murder under a theory of accountability.

(7) Whether defendant's sentences must be modified to concurrent terms because the record does not reflect that the court was of the opinion that consecutive sentences are necessary for the protection of society.

He first argues that his convictions should not stand because they are based almost exclusively upon the uncorroborated testimony of a lying accomplice who was admittedly highly intoxicated at the time of the offense, who admittedly could not recall much of the incident, who received favorable treatment from the prosecutor for agreeing to testify against the defendant, and whose testimony was substantially impeached. Defendant contends that his convictions rely almost exclusively upon the unreliable and unbelievable testimony of Bill Sturgill.

While a major part of the State's case did consist of the testimony of Bill Sturgill, the standard of review we must apply is whether after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (See *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472.) Once a defendant has been

found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. *Young*, 128 Ill. 2d at 49, 538 N.E.2d at 473; *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

Paul Conklin, Linda Peach, Sue Sturgill and Bill Sturgill each testified that there was drinking at the party. According to Linda's and Bill's testimony large quantities of beer were consumed. Both Linda Peach and Bill Sturgill testified that they saw the defendant drag Audie Wilson by the hair of his head into the garage. Linda testified that Woodrome, Bill Sturgill, her husband Wayne Peach and Schofield went into the garage, and soon thereafter, she could hear Audie Wilson pleading with them to stop. Later Wayne Peach told Linda that "they killed him." Linda saw Woodrome rinsing blood from a knife, observed Woodrome and the Sturgills leave in a pickup truck, and later saw the men burning their clothing which appeared to be bloodstained.

Sue Sturgill testified that at least one time during the evening her husband and Woodrome were in the garage. They asked her to back the pickup truck into the driveway, and later they asked her to drive them into town. During their drive to Mascoutah the men told Sue Sturgill to pull over. She observed them unload a bundle from the truck. Later she was told that it was Audie Wilson's body. Sue Sturgill was asked to get Woodrome, Bill Sturgill, and Schofield a change of clothing.

■■ Bill Sturgill testified that when he entered the garage on the evening in question, he saw Audie Wilson lying on the floor in a pool of blood. Woodrome was standing at Wilson's feet. Woodrome told Sturgill, "We beat him to death." Sturgill testified that he recalls loading Wilson's body into the truck and dumping it into Silver Creek. As for defendant's argument that Sturgill's testimony should be totally disregarded, the jury knew of Bill Sturgill's plea agreement with the State, and it was instructed that accomplice testimony was subject to suspicion (see Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981)). Any infirmities in Bill Sturgill's or the other witnesses' testimony go to the weight of the evidence and their credibility as witnesses. *People v. Young* (1989), 128 Ill. 2d 1, 51, 538 N.E.2d 461, 473.

The pathologist testified that Wilson's death was not caused by strangulation or drowning but was the result of a combination of occurrences, in particular blunt trauma to the head and chest. The serologist testified that various blood samples taken from the garage could

have come from Audie Wilson but could not have come from either Michael Woodrome, Bill Sturgill, William Schofield, or Wayne Peach.

While there was no testimony that anyone actually saw Woodrome beating Audie Wilson to death, a conviction may be based entirely upon circumstantial evidence. (*People v. Bruce* (1989), 185 Ill. App. 3d 356, 541 N.E.2d 708.) Given the totality of the evidence, it was sufficient for a rational jury to conclude, beyond a reasonable doubt, that the defendant was guilty of the first-degree murder of Audie Wilson and concealment of his homicidal death.

Defendant next argues that the jury was improperly instructed on accountability. The jury was given the issues in first-degree murder instruction incorporating accountability (Illinois Pattern Jury Instructions, Criminal, No. 7.02A (2d ed. Supp. 1989) (hereinafter IPI Criminal 2d)) and the following instruction on accountability:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of *any* offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of *an* offense.
>
> The word 'conduct' includes any criminal act done in furtherance of the planned and intended act." (Emphasis added.)

The accountability instruction parallels the language of Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981) (IPI Criminal 2d), except for the italicized words. The italicized "any" reads "an" in IPI and is not at issue here. Defendant argues that the italicized "an" in the given instruction, however, should read "the" as directed in the 1989 supplement to IPI Criminal 2d No. 5.03. The 1989 supplement to IPI Criminal 2d No. 5.03 provides that either "an" or "the" may be used in place of the underlined "an." (See IPI Criminal 2d No. 5.03 (Supp. 1989).) The Committee Note directs one to use the bracketed word "an" and the second paragraph when the offense charged is different from the offense planned and intended but is done in furtherance of the charged offense. (IPI Criminal 2d No. 5.03, Committee Note, at 76 (Supp. 1989).) Given the fact that the offense charged (murder) is different from the offense allegedly planned and intended (battery by dragging), the instruction conforms with the language as recommended by the 1989 supplement.

Defendant contends that the instruction given allowed the jury to find him guilty of murder based solely upon his act of dragging the victim into the garage without any evidence of his intending to aid the codefendants in any crime. Defendant argues that if he intended

to commit only a battery, then permitting the jury to find that he is guilty of murder is erroneous.

■ Defendant fails to recognize the applicability of the common-design rule. The common-design rule provides, " 'where two or more persons engage in a common criminal design or agreement, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts.' " (*People v. Terry* (1984), 99 Ill. 2d 508, 514, 460 N.E.2d 746, 748, quoting *People v. Kessler* (1974), 57 Ill. 2d 493, 496-97, 315 N.E.2d 29.) In *Terry* the supreme court applied the common-design rule to affirm a murder conviction even though an intent to kill was not proven. *Terry* found that the defendants could be held liable for murder committed by a third person pursuant to a conspiracy to commit battery, even though only a misdemeanor was originally intended. 99 Ill. 2d 508, 460 N.E.2d 746.

Under the common-design principle defendant was responsible for conduct done in furtherance of the intended battery even if the evidence did not prove that it was defendant who beat the victim to death. The result of their concerted acts was murder, and under the common-design rule, all are legally accountable for that murder. (See *Terry*, 99 Ill. 2d at 515, 460 N.E.2d at 749; see also Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c).) In determining legal accountability, a trier of fact may consider that the accused was present during the commission of a crime without opposing or disapproving it, that he maintained a close affiliation with his companion after the perpetration of the offense, and that he failed to report the crime. (*People v. Williams* (1987), 157 Ill. App. 3d 496, 506, 510 N.E.2d 445, 451.) Applying the instruction given, the jury could have found that defendant, during the commission of a battery (dragging Wilson), with the intent to promote that offense (battery by dragging), aided the codefendants in the planning or commission of murder. We cannot find that the jury was improperly instructed.

Defendant next argues that he was denied a fair trial because the prosecutor misstated the evidence during his closing argument and on rebuttal:

> "Bill Sturgill told you that he saw Woodrome's hands and it appeared that they had been puffed up. *** Audie Wilson was beaten to death. He was beaten to the point where his head was swollen."

> "Getting on top of a just turned—a young man, basically a boy just turned 21 years old, getting on top of him and pound-

ing him to death, breaking his ribs, breaking his nose, putting fifteen bruises on the top of his chest, and his hands were bruised then, that is murder."

Specifically, defendant asserts that there was no evidence that his hands were puffed up or bruised and there was no evidence that the defendant was on top of the victim.

During the prosecution's closing argument, defense counsel objected to both of the complained-of remarks. The trial court overruled both objections. As to the first remark, the court also instructed the jury, "If you hear anything that's not bound out by the evidence, you will disregard it." As for the second remark, the trial court stated, "The jury has a memory of what the testimony is and was not, and he may argue reasonable inferences in his argument."

Assuming the prosecutor's remarks were improper, the mere occurrence of improper remarks does not itself mandate reversal. (*People v. Whitfield* (1986), 140 Ill. App. 3d 433, 440, 488 N.E.2d 1087, 1092.) Timely objection by defense counsel and an appropriate admonition by the court may prevent error or, in the event error occurs, may render it harmless. (*People v. Moody* (1990), 199 Ill. App. 3d 455, 466, 557 N.E.2d 335, 342.) A conviction will not be reversed for improper closing argument unless the error was of substantial magnitude and was a material factor in the defendant's conviction. (*People v. Tannahill* (1987), 152 Ill. App. 3d 882, 887, 504 N.E.2d 1283, 1287.) To warrant reversal, the challenged remarks must be shown to have caused substantial prejudice when viewed in the context of the entire record. *People v. Gleash* (1991), 209 Ill. App. 3d 598, 608, 568 N.E.2d 348, 355.

■ The court admonished the jury to disregard any argument not based on the evidence. In addition, the written instructions provided that closing arguments should be confined to the evidence and to reasonable inferences to be drawn from the evidence and that any statement or argument not based on the evidence should be disregarded. After reviewing the record in this case, we do not believe that the prosecutor's remarks were a significant factor in the jury's determination.

Michael Woodrome next argues that the trial court abused its discretion by failing to grant him a new trial based upon newly discovered evidence which he claims demonstrates that Bill Sturgill committed perjury.

At the hearing on defendant's post-trial motion, defense counsel orally moved to amend his post-trial motion. The amendment concerned a letter sent to the court from Ronald Bireri. While the letter

itself is not part of the record on appeal, defense counsel read part of the letter into the record:

> "Myself, Ronnie Tucker and Luther Sturgill were all in the courthouse on the 23rd or 24th of January. We were in the first holdover on the right. Luther Sturgill said, 'Mike, you know you didn't do it. I only said what I knew your attorney could tear up.' "

Defendant argues that in light of this new evidence it is clear that Sturgill committed perjury, which entitles him to a new trial.

A motion for a new trial based on newly discovered evidence is addressed to the sound discretion of the trial court and will not be disturbed on review absent an abuse of discretion. (*People v. Baker* (1959), 16 Ill. 2d 364, 373-74, 158 N.E.2d 1, 6; *People v. Haun* (1991), 221 Ill. App. 3d 164, 581 N.E.2d 864.) The new evidence must be of such a conclusive nature that it would probably change the result upon retrial, it must be material to the issue and not merely cumulative, and it must not have been discoverable before trial through the exercise of due diligence. *People v. Miller* (1980), 79 Ill. 2d 454, 464, 404 N.E.2d 199, 204; *People v. DeCesare* (1989), 190 Ill. App. 3d 934, 943, 547 N.E.2d 650, 656.

■ Defendant relies solely on the out-of-court statement allegedly made by Sturgill and overheard by Bireri. The statement, "You know you didn't do it," is not necessarily a declaration that Sturgill believed that defendant did not commit the crime. Even if it were, it is well established that recantation testimony is not ordinarily a sufficient basis for a new trial. (*People v. Bushey* (1988), 170 Ill. App. 3d 285, 289, 524 N.E.2d 738, 741.) Newly discovered evidence which has only the effect of impeaching, discrediting, or contradicting the witness does not require a new trial. (*Haun*, 221 Ill. App. 3d at 175, 581 N.E.2d at 872.) Based on the standards set forth, we conclude that the trial court did not abuse its discretion in denying defendant a new trial based on newly discovered evidence.

The defendant next contends that he was denied a fair trial because the jury instruction on second-degree murder did not contain a phrase relating to accountability.

At the jury instruction conference defendant tendered an instruction patterned after IPI Criminal 2d No. 7.06A. Nowhere in that instruction was an accountability phrase incorporated. The court advised counsel that according to IPI Criminal 2d No. 7.06A (Supp. 1989), the accountability phrase needed to be inserted. Defense counsel asked the State to insert the accountability phrase at the appropriate places. The State incorporated the accountability phrase as it re-

lated to first-degree murder but did not incorporate it as it related to the lesser offense of second-degree murder. Defense counsel did not object to the final form of the instruction.

It is well settled that where a defendant fails to object to an asserted error in an instruction, any error is waived. (*People v. Britz* (1988), 123 Ill. 2d 446, 475, 528 N.E.2d 703, 717; *People v. Smith* (1988), 165 Ill. App. 3d 603, 518 N.E.2d 1382.) We could find that defendant waived the alleged error but will decline to do so because of defendant's additional claim that his trial counsel was ineffective for failing to tender an appropriate instruction. To establish ineffective assistance of counsel, a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to deprive him of a fair trial, a trial whose result is reliable. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255; see also *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. (*Albanese*, 104 Ill. 2d at 525, 473 N.E.2d at 1255.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice *** that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069-70.

The instruction given to the jury read:

"To sustain the charge of first degree murder, the State must prove each of the following propositions:

*First: That the defendant or one for whose conduct he is legally responsible* performed the acts which caused the death of Audie Wilson; and

*Second: That when the defendant or one for whose conduct he is legally responsible*, did so,

(1) he intended to kill or do great bodily harm to Audie Wilson; or

(2) he knew that his acts would cause death to Audie Wilson; or

(3) he knew that his acts created a strong probability of death or great bodily harm to Audie Wilson; and

*Third: That the defendant or one for whose conduct he is legally responsible* was not justified in using the force which he used.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a

reasonable doubt, you should find the defendant not guilty of first degree murder, and your deliberations on this charge should end.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, then you should go on with your deliberations to decide whether a mitigating factor has been proved so that the defendant is guilty of the lesser offense of second degree murder instead of first degree murder.

*You may not consider whether the defendant is guilty of the lesser offense of second degree murder until and unless you have first determined that the State has proved beyond a reasonable doubt each of the propositions of first degree murder.*

The defendant has the burden of proving by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder instead of first degree murder. By this I mean that *you must be persuaded, considering all the evidence in the case, that it is more probably true than not true that the following mitigating factor was present; that the defendant, at the time he performed the acts which caused the death of Audie Wilson,* believed the circumstances to be such that they justified the deadly force he used, but his belief that such circumstances existed was unreasonable.

If you find from your consideration of all the evidence that the defendant has proved by a preponderance of the evidence that he is guilty of the lesser offense second degree murder instead of first degree murder, you should find the defendant guilty of second degree murder.

If you find from your consideration of all the evidence that the defendant has not proved by a preponderance of the evidence that he is guilty of the lesser offense of second degree murder instead of first degree murder, you should find the defendant guilty of first degree murder." (Emphasis added.)

Defendant argues that the absence of the accountability phrase ("the defendant or one for whose conduct he is legally responsible") in the second-degree murder instruction excluded the possibility of defendant being found guilty of second-degree murder under a theory of accountability.

Section 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—2) defines the elements of second-degree murder, which include two mitigating factors which can be raised by a defendant who

has been charged with first-degree murder: (1) acting under sudden and intense passion; or (2) belief that one's actions are justified even though they are in fact unreasonable. (*People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141.) Once the State has proved the elements of first-degree murder beyond a reasonable doubt and the defendant proves either of these mitigating factors by a preponderance of the evidence, the offense of first-degree murder will be reduced to second-degree murder. (*People v. Willis* (1991), 217 Ill. App. 3d 909, 924-25, 577 N.E.2d 1215, 1225.) It is not incumbent on the State, in proving the elements of first-degree murder, to prove the nonexistence of the mitigating factors of section 9—2. 217 Ill. App. 3d at 925, 577 N.E.2d at 1225.

■ We fail to see how the result of the proceedings would have been different had the jury instruction included the accountability phrase. Whether the jury instruction directed the jury to examine the belief of Woodrome or the belief of one for whose conduct he was legally responsible is of no consequence given the evidence in this case.

Evidence which might be construed as showing that the harm inflicted upon Audie Wilson arose from a sudden intense passion consisted of the evidence that Sue Sturgill flirted with Audie Wilson. Sue Sturgill testified that she did not flirt with Wilson, but Linda Peach testified that Sturgill flirted with just about everyone that evening. More importantly, Bill Sturgill testified that he did not know whether his wife flirted with Wilson that night. The provocation sufficient to support a reduced charge from murder to voluntary manslaughter must be such as to excite an intense passion in a reasonable person. (*People v. Proper* (1979), 68 Ill. App. 3d 250, 254, 385 N.E.2d 882, 886.) Because there was no evidence that Bill Sturgill had any knowledge of his wife's flirting, the provocation evidence in this case is insufficient to support a finding that the harm inflicted upon Wilson was the result of a sudden and intense passion.

Evidence tending to show that the defendant or the other accomplices believed their actions justified even though such action was unreasonable includes evidence that the men at the party were drinking beer. There was also evidence that Wilson may have been "horseplaying" or scuffling in the kitchen. Defendant argues that the jury could have inferred that defendant dragged Wilson into the garage to prevent him from further "horseplay." Bill Sturgill is the only witness who testified that his intoxication impaired his power of reason. There is no direct evidence of Woodrome's intoxication or his reason for dragging Wilson into the garage. There was evidence that after Woodrome dragged Wilson into the garage Wilson was heard to say,

"Please, please, no more." Thereafter, Wayne Peach emerged from the garage with a broken dental plate.

Even if defendant believed that his actions were justified when he dragged Wilson into the garage, the subsequent conduct which caused Wilson's death was not justified. Dr. Nuernberger testified to the extensive injuries inflicted upon Wilson. It is true that subsequent wounds do not necessarily negate a claim of self-defense where the victim continues to present a danger to the defendant. (*People v. Willis* (1991), 210 Ill. App. 3d 379, 385, 569 N.E.2d 113, 116.) However, there is no evidence in this case, other than Wayne Peach's broken dental plate, to suggest that Wilson presented a threat to anyone. There is simply a lack of evidence to support defendant's theory that the force used against Wilson was believed to be justified. Based upon the record, we reject defendant's contention that the jury instruction amounts to reversible error. We cannot conclude that based on the evidence there is a reasonable probability that the result of the proceedings would have been different had the second-degree murder instruction included an accountability phrase.

Defendant's next argument is that his trial counsel was ineffective for failing to object to the alleged inculpatory hearsay of codefendant Wayne Peach. Specifically, the defendant argues that "Linda Peach's testimony that Wayne Peach had told her that defendant had said that he had killed Wilson was clearly hearsay." Defendant contends that this evidence violated the rule in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, that in a joint trial the nontestifying codefendant's confession may not be introduced against the defendant. Defendant argues that Wayne Peach was a nontestifying codefendant and what defendant purportedly told him was inadmissible hearsay.

■ We initially note that the testimony complained of is not what the defendant contends. Linda Peach testified:

"Q. [By Prosecutor] Were you aware that Audie Wilson was killed that evening?

A. [By Linda Peach] Yes.

Q. And when did you find that out?

A. After Wayne got hit in the mouth and got his teeth broke cause he wears a false plate, he came outside and told me that they killed him."

Hence, it is clear that there was no statement by the defendant confessing to the crime. The defendant recognizes this in his statement of facts where he notes that Linda Peach did not say who "they" were.

The admission of this testimony did not violate the *Bruton* rule. The statement by Linda Peach was not the type of testimony at issue in *Bruton*. *Bruton* involved an express confession by a nontestifying codefendant which clearly implicated the defendant. The holding in *Bruton* was based, in part, on the fact that powerfully incriminating extrajudicial statements of a codefendant are deliberately spread before the jury in a joint trial. (*Bruton*, 391 U.S. at 135-36, 20 L. Ed. 2d at 485, 88 S. Ct. at 1628.) The instant case does not involve an express confession by Wayne Peach, and Linda Peach never explicitly stated that Wayne implicated the defendant. Furthermore, the State did not argue that because Wayne "confessed" defendant was guilty. Hence this case does not involve a *Bruton*-type violation.

The instant case is similar to *People v. Harris* (1990), 204 Ill. App. 3d 491, 561 N.E.2d 1361. In that case a police detective testified to a confession given by a codefendant. On appeal the defendant argued that this testimony was hearsay and violated his right to confront an adverse witness. In rejecting this argument, the court noted that the codefendant's confession did not explicitly implicate the defendant, that the State did not use the testimony against the defendant, and that the State did not argue that because of the codefendant's confession the defendant was guilty. *Harris*, 204 Ill. App. 3d at 497, 561 N.E.2d at 1361.

In order to show counsel provided ineffective assistance, the defendant must establish that counsel's performance fell below an objective standard of reasonableness and that but for counsel's errors the result would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) Based on the foregoing, we do not conclude that counsel was ineffective in failing to object to Linda Peach's testimony.

Defendant's final argument on appeal is that the circuit court erred in imposing consecutive prison sentences of 50 and 5 years for murder and concealment of a homicidal death, respectively. He argues that the record fails to show that the circuit court was of the opinion that consecutive sentences were necessary to protect the public.

■ Section 5—8—4(b) of the Unified Code of Corrections provides:

> "The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct

by the defendant, the basis for which the court shall set forth in the record." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—4(b).) The supreme court has held that the statutory requirement that the court "shall set forth in the record" the basis for the court's determination is permissive rather than mandatory and may be waived. (*People v. Hicks* (1984), 101 Ill. 2d 366, 374, 462 N.E.2d 473, 477; see also *People v. Haun* (1991), 221 Ill. App. 3d 164, 581 N.E.2d 864.) In this case the defendant did not request a specific finding of the sentencing court relative to the protection of the public, nor did he complain that a basis for the required statutory finding was not articulated. We find, therefore, that defendant's objection to the trial court's failure to enumerate its reasons is waived.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

WELCH and W.A. LEWIS, JJ., concur.