THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EARNEST MERRITTE, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WALTER MERRITTE, Defendant-Appellant.

Third District    Nos. 3—91—0687, 3—91—0688 cons.

Opinion filed March 23, 1993.

Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellants.

Joseph Navarro, State's Attorney, of Ottawa (John X. Breslin and Robert M. Hansen, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SLATER delivered the opinion of the court:

Following a jury trial, defendants Earnest and Walter Merritte were convicted of first degree murder. Earnest Merritte was sentenced to a term of 80 years' imprisonment. Walter Merritte was sentenced to natural life imprisonment. Defendants now appeal from their convictions and sentences. We affirm.

Mark Harcar was beaten to death on October 26, 1990, near Tony's Meat Market in Streator, Illinois. William Vietti, a friend of the victim, testified that he was with Mark on the day he was killed. Vietti met Mark at the market at about 5 p.m. They spent the evening drinking beer and burning boxes and papers from the market. The market, owned by members of the Harcar family, was being remodeled. Vietti brought 8 to 12 beers with him to the market and bought three additional 12-packs of beer during the course of the evening. Jeffrey Harcar, the victim's 14-year-old nephew, arrived around 10:15 p.m. Jeffrey did not see his uncle drinking beer, but he thought that Vietti was drunk.

Jeffrey Harcar and Vietti both testified regarding an incident involving two black women who walked by the market that evening. According to Jeffrey, as the women walked by, Vietti said, "Maybe we can get a B.J. from these two girls." Vietti walked up to the women and said something that Jeffrey could not hear. Jeffrey then heard one of the women say that they did not like being called niggers. Vietti left the women and they continued to walk down the street.

According to Vietti, Mark Harcar said to him, "There's two for you" as the women walked by, and then yelled out, "How about a blow job, mama?" Vietti approached the women and they asked, "What's his [Mark's] problem?" Vietti told them that Mark didn't like blacks. One of the women shook Vietti's hand, and he returned to the trash fire where Mark and Jeffrey were standing.

Both Jeffrey Harcar and Vietti agreed that after Vietti returned from talking to the women, Mark Harcar got into Vietti's truck and followed the women. At one point, the women moved from the street to a path that had been a sidewalk and yelled at Mark not to run them over. Mark later turned around and returned to the market and the women continued on their way.

Gwendolyn Patterson testified that she and Earl Phillips were in Streator on October 26, 1990, drinking and socializing with Alice Phillips. At about 10 p.m. the three of them, along with Jessie Phillips, drove to a tavern where the women got out and the men drove away. Patterson and Alice Phillips were unable to enter the tavern because they did not have membership cards so they walked through town looking for Earl or for someone to give them a ride. As they walked past the meat market around 10:30 p.m., one of two men standing outside the market called out, "You niggers." One of the men approached and Patterson asked him why they had called them niggers. The man said that the other man had called out to them, not him. Patterson and the man shook hands and she and Alice Phillips continued to walk down the street. The second man soon drove up behind them in a truck, and the women left the street, running into a yard. Patterson picked up a brick and told the man that she would throw it through his windshield if he tried to run them over. The man pulled into a vacant lot across the street and, according to Patterson, said, "You nigger bitches come through here again, you're as good as dead." The man, whom Patterson identified as Mark Harcar, then drove back to the meat market.

Patterson further testified that she and Alice later found someone to give them a ride to look for Earl Phillips. On the way, they stopped at a liquor store and bought some beer and whiskey. They eventually found Earl and some other people, including Earnest and Walter Merritte, outside an apartment in Streator. Patterson had known the Merrittes for about eight years. She told the group about the incident at the meat market, and a number of people, including Patterson, the Merrittes and Alice, and Earl and Jessie Phillips, got into two cars and drove to the market at about 11 or 11:30 p.m.

Vietti testified that when he saw the two cars drive up to the market, he told Mark Harcar that they were outnumbered and that they should go inside the market. According to Vietti, Harcar said "f--- it," grabbed a piece of conduit, and began walking in the direction of the cars. Vietti went inside the market and locked the door.

Gwendolyn Patterson and Earl Phillips testified that after parking the cars, they walked toward the market along with the **Merrittes and**

Alice Phillips. Patterson picked up a four-foot-long stick and saw Mark Harcar approaching with a shovel in his hands. Walter Merritte asked Harcar why he had tried to run the women over. Harcar denied it. Patterson became angry, insisted Harcar had tried to run them over and swung the stick at Harcar, which he blocked with the shovel. Patterson then saw Harcar get hit with a beer can and fall to the ground. Earl Phillips testified that the can was thrown by Earnest Merritte. After Harcar fell, Patterson jumped on top of him and began hitting him with her fists. Walter Merritte told Earl Phillips to pull Patterson off of Harcar. Walter Merritte then began hitting Harcar in the side with the shovel that Harcar had dropped when he fell. Earnest Merritte, meanwhile, was kicking Harcar in the back. During this time, Harcar was lying on his side, covering up his head with his hands and forearms.

Earl Phillips further testified that Gregory Ennis appeared on the scene, picked up a wire milk crate and used it to beat Harcar in the head. Earl stated that he hadn't seen Ennis earlier that evening and didn't know where Ennis had come from. Patterson claimed that she had seen Ennis earlier in the day at Alice Phillips' house but she did not see him at any time later that day. Patterson stated that she did not know that Ennis had been involved in the beating until the next morning when Ennis told her that he had beaten Harcar in the head with an iron crate.

According to Patterson, the beating ended when she and Alice Phillips told the Merrittes to stop. Patterson thought that the entire incident lasted three or four minutes. Earl Phillips testified that the beating stopped when Earnest Merritte stepped between Ennis and Walter Merritte and told them that that was enough. Earl thought that the incident lasted 11 or 12 minutes.

Jessie Phillips testified that he went to the market but he stayed where the cars were parked and he did not witness the beating. Jessie knew Greg Ennis but he did not see him that night.

Doctor Mary Jumbelic, a forensic pathologist who performed the autopsy on Mark Harcar, testified that he sustained numerous injuries, including four skull fractures. In addition to the head injuries, there were abrasions on the chest and hands and bruising on the back, left side, left arm and both legs, along with four broken ribs and a ruptured spleen. In Jumbelic's opinion, the victim died as a result of injuries to the skull and brain caused by blunt trauma. Contributing causes of death were a lacerated spleen and fractured ribs. Jumbelic stated that the skull injuries and certain abrasions on the body were consistent with being struck by a shovel. An abrasion on the upper

left chest was consistent with being struck by a wire metal crate. On cross-examination, Jumbelic testified that the skull injuries could have been caused by a baseball bat, a hammer, the butt of a gun or a two-by-four. Jumbelic could not determine exactly what kind of object caused the injuries.

The parties stipulated that forensic scientist Arlene Hall would testify that no blood was found on the shovel, but blood was found on a pair of white jogging pants. This blood could have come from Mark Harcar but it could not have come from Gregory Ennis or either of the Merrittes. The jogging pants had been worn by Ennis on the day of the beating, according to Earl Phillips. The pants were found in a hole in a wall at the home of Earl Phillips' mother.

As indicated earlier, the jury found both defendants guilty of first degree murder. At the sentencing hearing, the trial court found that the defendants' conduct was brutal and heinous and indicative of wanton cruelty. The court referred to the photographs of the victim presented at trial and noted that it had never seen anyone beaten more viciously. The court found that no mitigating factors were present and, after discussing the factors in aggravation, sentenced Walter Merritte to natural life imprisonment and Earnest Merritte to a term of 80 years' imprisonment.

Defendants first contend that they were denied a fair trial because the jury may have found them guilty on the basis of Gregory Ennis' actions, rather than their own. The jury was instructed that the defendants could be convicted on the basis of accountability, and in closing argument the prosecutor told the jury that the defendants were legally responsible for the acts of Ennis. Defendants argue that they could not be held accountable for Ennis' acts because Ennis was not with the defendants prior to the beating and arrived after the beating began. Defendants also note that there was no plan between Ennis and the defendants to engage in illegal conduct, nor did the defendants invite or encourage Ennis to participate in the beating.

Section 5—2 of the Criminal Code of 1961 provides in part:

"A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1989, ch. 38, par. 5—2.

The State has met its burden of proving that a defendant intended to promote or facilitate the offense where it establishes that the defendant shared the criminal intent of the principal or where there was a community of unlawful purpose. (*People v. Hudson* (1988), 165 Ill. App. 3d 375, 519 N.E.2d 28.) A conviction based on a theory of accountability will be upheld where more than one person engages in an assault and the defendant, by his participation, encourages the perpetration of the offense. (*Hudson*, 165 Ill. App. 3d 375, 519 N.E.2d 28.) A common purpose to commit a crime can be inferred from the circumstances of the offense; words of agreement are not necessary to establish a common criminal design. (*People v. Lovelady* (1991), 221 Ill. App. 3d 829, 582 N.E.2d 1217; *Hudson*, 165 Ill. App. 3d 375, 519 N.E.2d 28.) A trial court's finding that a defendant is legally accountable for the criminal conduct of another will not be disturbed unless the evidence, when viewed in the light most favorable to the prosecution, is so improbable or unsatisfactory that a reasonable doubt of guilt exists. *People v. Haynes* (1991), 223 Ill. App. 3d 147, 583 N.E.2d 1177; *Lovelady*, 221 Ill. App. 3d 829, 582 N.E.2d 1217.

We recognize that defendants' argument is not framed as a challenge to the sufficiency of the evidence, but is instead based on the possibility that they were convicted for Ennis' actions. Analytically, however, the issue is the same. If the evidence was sufficient to support the defendants' conviction on the basis of accountability for Ennis' conduct, then the jury was properly instructed concerning accountability.

■ We find that there was ample evidence to support the defendants' conviction on the basis of accountability. In *People v. Perez* (1985), 108 Ill. 2d 70, 483 N.E.2d 250, the defendant saw two individuals stab the victim and then run away. The victim pursued his attackers. The defendant ran after the victim and stabbed him as he struggled with one of his original assailants. The defendant argued that he could not be held accountable for the acts of the original attackers because there was no showing that he acted according to a preconceived plan or agreement to kill the victim. The supreme court stated that evidence that a person voluntarily attaches himself to a group bent on illegal acts with knowledge of its design will support an inference that he shared a common purpose and will sustain a conviction for a crime committed by another in furtherance of the venture. The court concluded that "even though defendant's actions may have been spontaneous, his participation in the stabbing made him legally accountable for the actions of every other member of the group." *Perez*, 108 Ill. 2d at 83, 483 N.E.2d at 256.

Similarly, in this case, the defendants are responsible for the actions of those who took part in the beating of Mark Harcar, including the actions of Gregory Ennis. While this case represents the converse of that presented in *Perez* (*i.e.*, accountability of the *initial* attackers for the acts of a *subsequent* assailant), we find such a distinction to be irrelevant under the circumstances. The evidence is clear that Earnest and Walter Merritte and Gregory Ennis engaged in a common design to brutally beat Mark Harcar, and each of them is legally accountable for his death. See *Perez*, 108 Ill. 2d 70, 483 N.E.2d 250; see also *People v. Woodrome* (1992), 237 Ill. App. 3d 220, 604 N.E.2d 486; *People v. Walker* (1992), 230 Ill. App. 3d 377, 594 N.E.2d 1252; *Hudson*, 165 Ill. App. 3d 375, 519 N.E.2d 28.

Defendants next contend that a new sentencing hearing is required because the trial court failed to consider a mitigating factor and improperly relied upon two aggravating factors. Defendants first argue that Harcar's insults, threats and attempt to run over Patterson and Alice Phillips, which defendants were told of shortly before the beating, were strong provocation which should have been considered as a mitigating factor. The trial court found that any provocation had occurred "quite sometime" prior to the beating and that the defendants were only "second-hand recipients" of the provocation.

Section 5—5—3.1 of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.1) sets forth the mitigating factors that a trial court is to consider when imposing sentence. Among those factors is that the defendants acted under a strong provocation (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.1(a)(3)). While the term "strong provocation" is not defined in the Unified Code of Corrections, the similar term "serious provocation" has a well-established meaning under Illinois law. When considering whether an individual has acted under serious provocation sufficient to reduce the offense of first degree murder to second degree murder, the only categories of serious provocation recognized by our courts are substantial physical injury or assault, mutual quarrel or combat, illegal arrest and spousal adultery. (*People v. Chevalier* (1989), 131 Ill. 2d 66, 544 N.E.2d 942.) Mere words, no matter how abusive or indecent, are not considered serious provocation. (*Chevalier*, 131 Ill. 2d 66, 544 N.E.2d 942.) The facts presented here clearly do not rise to the level of serious provocation.

■ Defendants maintain, however, that strong provocation as a mitigating factor should be interpreted more broadly than serious provocation in the second degree murder context because mitigating factors are not defenses which excuse a defendant's criminal conduct but are simply grounds tending to favor a more lenient sentence. We

agree that strong provocation as a mitigating factor at sentencing encompasses a wider range of conduct than that defined as serious provocation under the second degree murder statute. Certainly, if the defendants had been insulted and threatened by Harcar in the manner described by Gwendolyn Patterson and Alice Phillips, and the defendants had then attacked Harcar, it would have been error for the court to find that they had not been strongly provoked. The provocation in this case, however, was neither direct nor immediate. Under the circumstances, we are unable to find that the trial court erred in determining that the defendants were not acting under a strong provocation.

The defendants further claim that the trial court improperly considered that their conduct caused or threatened serious harm, a factor which is inherent in the offense of murder. (See *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138.) The basis of this alleged error is the following statement by the court:

> "The conduct of both in this matter caused and threatened serious harm. I've covered that amply in my discussion with the factors in mitigation, the factors in aggravation."

As defendants note, the court had in fact referred to the severe harm factor in its earlier discussion of the statutory mitigating factors.

> "Defendants' criminal conduct neither caused nor threatened serious physical harm to another. That speaks for itself. We have a death."

Defendants acknowledge that this comment indicates that the court recognized that serious physical harm is an inherent element of murder. Defendants nevertheless argue that the court then considered this same factor in aggravation. We disagree.

A review of the transcript of the sentencing hearing shows that the trial court addressed each of the applicable factors in mitigation and aggravation in the order in which they appear in the Unified Code of Corrections. (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3.1, 1005—5—3.2.) In discussing serious harm as a mitigating factor, the court recognized that harm was an inherent element of the offense. When discussing the same factor in aggravation, the court simply referred back to its earlier discussion. Such a remark was proper and does not indicate that the court improperly considered serious harm as an aggravating factor. "It is unrealistic to suggest that the judge sentencing a convicted murderer must avoid mentioning the fact that someone has died or risk committing reversible error." *People v. Barney* (1982), 111 Ill. App. 3d 669, 679, 444 N.E.2d 518, 525.

Defendants also contend that the trial court improperly considered the defendants' decision not to testify or exercise their right of allocution as evidence of a lack of remorse. Defendants' argument is premised on the following statement by the court:

"I can see nothing in the record, any statements that have been made to this [c]ourt, proffered, that in any way indicates any remorse for the crime here."

In determining whether a sentence was properly imposed, a reviewing court should not focus on a few isolated words or statements, but should consider the entire record as a whole. (*People v. Ward* (1986), 113 Ill. 2d 516, 499 N.E.2d 422; *People v. Fenderson* (1987), 157 Ill. App. 3d 537, 510 N.E.2d 479.) Immediately prior to the remark related above, the court stated:

"I have presided through the trial and observed the demeanor, the attitude of the parties as they have sat here. The attitude during the trial of the defendants does not in any way exhibit remorse, did not give any reflection as to the seriousness of the crime with which they here stood charged."

■ Considered in context, we find that the court's remark that no statements had been made indicating remorse was merely an observation that defendants chose not to exercise their right of allocution and was not a significant factor in finding that the defendants showed no remorse. A defendant's remorse or the lack of it is a proper subject for consideration at sentencing (*People v. Barrow* (1989), 133 Ill. 2d 226, 549 N.E.2d 240), and we find no error here.

Finally, defendants contend that their sentences were excessive and constituted an abuse of discretion by the trial court. Defendants argue that their conduct was provoked by the victim and was spontaneous and unpremeditated, that they did not intend to kill the victim, and that their sentences were grossly disparate to the 60-year sentence imposed on Gregory Ennis. Ennis was tried separately and also convicted of first degree murder. In addition, defendant Earnest Merritte contends that his actions were not brutal and heinous and therefore he was not eligible for an extended-term sentence.

It is the trial court's task to fashion a sentence which strikes the proper balance between the protection of society and rehabilitation of the defendant (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541) and that determination will not be disturbed absent an abuse of discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882). The sentencing court's judgment depends upon many factors, including the defendants' demeanor, moral character and mentality, and its

determination is entitled to great deference and weight. *Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882.

■ We have already found that the court did not abuse its discretion in finding a lack of strong provocation. The spontaneity of defendants' acts and the absence or presence of premeditation and intent to kill are simply circumstances of the offense to be considered by the trial court in passing sentence. The court is not obligated to recite and assign value to each fact presented at a sentencing hearing. (*People v. Meeks* (1980), 81 Ill. 2d 524, 411 N.E.2d 9.) The record shows that the trial court considered the arguments of counsel, the presentence reports and the statutory factors in aggravation and mitigation. The court noted that, after being knocked to the ground, the victim was defenseless and that he had never seen a more viciously beaten victim. The court also pointed out that both of the defendants had prior criminal records. Earnest Merritte had two juvenile adjudications of delinquency for burglary and adult convictions for battery and residential burglary. Walter Merritte had previously been convicted of robbery, armed robbery and possession of a stolen vehicle. He was on mandatory supervised release at the time of the instant offense. The court further found that the defendants' prospects for rehabilitation were very limited in light of their poor disciplinary records while in prison and that the sentences were necessary to deter others. Under the circumstances, we find no abuse of discretion, nor do we find that defendants' sentences were grossly disparate to the 60-year sentence given to Gregory Ennis. While similarly situated defendants should not receive grossly disparate sentences, differences in sentences may be justified by the relative character and history of the codefendants, the degree of culpability, rehabilitative potential or a more serious criminal record. (*People v. Foster* (1990), 199 Ill. App. 3d 372, 556 N.E.2d 1289.) Ennis, who had prior convictions for battery and resisting arrest, had never been sentenced to prison. The criminal records of Earnest and Walter Merritte were much more serious and both had served time in prison. The defendants' disciplinary records while in prison were poor, indicating a lack of potential for rehabilitation. We find that these factors are sufficient to justify the disparity between Ennis' sentence and those imposed upon the defendants. See *People v. Coleman* (1990), 201 Ill. App. 3d 803, 559 N.E.2d 243.

■ We additionally find that the trial court did not err in finding Earnest Merritte eligible for an extended-term sentence on the basis of exceptionally brutal or heinous behavior indicative of wanton cruelty (see Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(2)). Although

defendant's actions may not have been as brutal as those of Walter Merritte and Gregory Ennis, we will not disturb the trial court's finding that it is brutal and heinous behavior to kick a man who has been knocked to the ground and "is helpless, is defenseless, and at that point can do absolutely nothing to defend his life and he is not at that time a threat to anyone." Furthermore, in addition to his own conduct, the defendant was accountable for the brutal and heinous behavior of Walter Merritte and Ennis. (See *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362; *People v. Tibbs* (1981), 103 Ill. App. 3d 73, 430 N.E.2d 681.) Finally, we note that defendant was eligible for an extended-term sentence based on his prior conviction for residential burglary. See Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(7); *People v. Tipton* (1990), 207 Ill. App. 3d 688, 566 N.E.2d 352 (extended-term statute permits imposition of extended term if any one of the enumerated factors is present).

For the reasons stated above, the judgment of the circuit court is affirmed.

Affirmed.

McCUSKEY, P.J., and STOUDER, J., concur.